UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
FRANKLIN MASCOL, _et al._ on behalf of
themselves and other similarly situated
individuals,

                         Plaintiff(s),

        -against-

E & L TRANSPORTATION, INC., _et al.,_

                         Defendant(s).
------------------------------------------------------x

**Case No.: 03 CV 3343
(CPS)(MDG)**

## REPLY MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' CROSS MOTION TO DISMISS AND IN FURTHER OPPOSITION TO THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CLASS CERTIFICATION

Respectfully Submitted:

TRIVELLA, FORTE & SMITH, LLP
Attorneys for the Defendants
1311 Mamaroneck Avenue, Suite 170
White Plains, New York 10605
Tel. No.: (914) 949-9075
Fax No.: (914) 949-4752
By: Edward R. Hopkins (EH 0590)

TABLE OF CONTENTS                                         PAGE

PRELIMINARY STATEMENT ................................................................................1

FACTS ..................................................................................................................... 3

ISSUES TO BE PRESENTED ................................................................................ 5

ARGUMENT ..............................................................................................................7

POINT ONE ...............................................................................................................7

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
SHOULD BE DENIED ...............................................................................................7
   A.   The Size Of The Potential Class, Twenty Seven (27),
       Does Not Satisfy The Numerosity Requirement Of
       FRCP 23(A)(1) ...................................................................................7
   B.   The Issue Of Damages Predominates; Plaintiffs' Claims
       Do Not Satisfy The Commonalty And Typicality
       Requirements........................................................................................ 9
   C.   The Court Should Require That Plaintiffs
       Arbitrate Their Overtime Claims.......................................................10
   D.   Plaintiffs May Not And Their Counsel May Not Adequately
       Represent The Proposed Class. ......................................................... 11
     1.   The Putative Plaintiffs Have Not Demonstrated The
         Financial Wherewithal To Assume Financial Burden Of
         A Class Action...................................................................................... 11
     2.   Defendants Have Pointed Out The Fallibilities Of
         Plaintiffs' Counsel. ............................................................................ 11
   E.   Plaintiffs Still Have Not Waived Their Claims
       For Liquidated Damages......................................................................13

POINT TWO .............................................................................................................15

DEFENDANTS ARE ENTITLED TO AN ORDER DISMISSING THE
COMPLAINT ...........................................................................................................15
   A.   Defendants Are Subject To The "Taxicab Exemption"...........................15
     1.   The Wage and Hour Division's Opinion Letter of April 17, 1998. ....... 20
     2.   The DOL Determination Letter Of February 20, 1996 Is Not
         Invalidated By Herman v. Brewah Cab. ............................................... 23
   B.   Defendants Have Met Their Burden...................................................... 28
     1.   The Kryzhanovsky Affidavit Explains The Calculations And
         Demonstrates That There Are No FLSA Violations. .............................31

2. The Pay Stubs Do Not Demonstrate That Defendants
   Failed To Pay Overtime; In Fact, Defendants Paid Overtime
   Although They Operated Under The Taxicab Exemption....................34
3. The Defendants Can Rely On The Terms Of The Collective
   Bargaining Agreement. ........................................................................35

POINT THREE ........................................................................................................39

SINCE 1994, DEFENDANTS HAVE CONTRACTED WITH DRIVERS TO
PROVIDE A GUARANTEED 60 HOUR WORKWEEK ......................................39

CONCLUSION ........................................................................................................43

## PRELIMINARY STATEMENT

This Reply Memorandum is filed on behalf of the defendants in support of defendants' cross-motion to dismiss and in further opposition to the plaintiffs' motion for class certification and for partial summary judgment. The Reply Memorandum of Law is also submitted in support of the defendants' cross-motion for summary judgment dismissing the Complaint since the defendants are exempt not only as a taxi company from the overtime provisions of the Fair Labor Standards Act ("FLSA") but also exempt under 29 C.F.R. 778.411, the sixty (60) hour limit on pay guaranteed by contract.

For the reasons set forth below, the Court should deny the motion for class certification and strike the class averments in the complaint. In the alternative, if the Court determines not to deny the plaintiffs' motion, the defendants request that this Court postpone the class determination pending further discovery directed to that issue.

The defendants respectfully submit that the Court should deny partial summary judgment on the overtime issue. Genuine issues of fact preclude summary judgment, since the collective bargaining agreement ("CBA") by its terms provides that the weekly wage payment made to the employees who work sixty (60) hour workweeks as regular full-time drivers includes overtime pay. Therefore discovery and parol evidence are necessary to interpret the collective bargaining agreement. Prior to the CBA, the employer made an oral agreement with each driver to pay a guaranteed salary for a 60 hour workweek which was

based on a formula. Further, the exhibit, the Ennis Report, that the plaintiffs have submitted as the overtime calculation for the putative class of plaintiffs is grossly defective since the overtime data is seriously miscalculated.

Finally, since the defendants are exempt from the overtime provisions of the FLSA both because of a guaranteed sixty (60) hour contracted workweek and because it is a taxicab company, there is no federal question, and the Court should decline to assert pendent jurisdiction over the state overtime claims. The Court should grant the defendants' cross-motion to dismiss this action, together with awarding the defendants their attorneys' fees and costs.

## FACTS

The defendants have argued that they are exempt from the overtime provisions as per the taxi driver exception to the overtime provisions of the FLSA 29 U.S.C. § 213(b) (17).  The defendants should also be deemed exempt from the FLSA overtime provisions pursuant to 29 U.S.C. § 207(f), since they contracted with their regular full time drivers to work a sixty (60) hour work week with the salary guaranteed.

Prior to the effective date of the collective bargaining agreement ("CBA"), employees worked a sixty (60) hour workweek explained in detail at the initial interview and agreed upon at the hiring interview. Matalon Aff.[1] The CBA was extended by agreement between the parties. See Hopkins Aff. Ex. "M".[2] Only since September 2001, with the change in management and discipline problems with the drivers not working a full 60 hour workweek and as a result of developments in this litigation, has the guaranteed sixty (60) work week and salary been phased out (on account of the potential liability pursuant to the FLSA).

The plaintiffs also attached an exhibit written and constructed by their own accountant. This is the Ennis Report which purports to calculate an overtime arrearage. The Ennis Report is a gross miscalculation. The defendants dispute the overtime calculation and argue genuine issues of fact. In plaintiffs' reply paper, they ignored any of defendants' criticisms of the Ennis Report. Plaintiffs offered

---

[1] We cite herein to the affidavit of Ely Matalon as "Matalon Aff. ___".
[2] We cite the Affirmation of Edward R. Hopkins to "Hopkins Aff. ___".

no rebuttal to defendants' attack on the Ennis Report whatsoever. Defendants submit that the fact that the CBA between the defendant E & L Transportation and the Teamsters former Local 513, AFL-CIO contains an express provision that the weekly 60 hour wage payment already contains an overtime payment for regularly scheduled drivers, and that the defendants are also exempt from the FLSA overtime because they were deemed eligible for the taxicab exemption, preclude summary judgment and require further discovery.

## ISSUES TO BE PRESENTED

In addition to the issues presented in defendants' responsive motion papers, the following issues, defendants submit, are also before this court:

1. Does the proposed class satisfy the requirements of Rule 23(a)(1)since the numerousity requirements cannot be satisfied by the plaintiffs since there were only 27 drivers who opted in?

2. Whether the putative plaintiffs are entitled to partial summary judgment for the amounts set forth in the attached exhibits to the Levy, Mascol, Washington, Torres, Stevens, Straker, and Philbert Affidavits submitted in support of the plaintiffs' motion, when that calculation is incorrect, when there are issues of fact as to whether the individuals worked the hours claimed, and when there is an issue of what was the hourly base rate of pay of the putative class members. Plaintiffs did not respond to defendants' arguments about the Ennis Report whatsoever.

3. Whether there are genuine issues of fact as to whether the defendants willfully or otherwise failed or refused to pay overtime to the members of the putative class.

4. Whether the putative plaintiffs consent to waive liquidated damages which is a necessary prerequisite to certifying the plaintiffs' New York State Labor Law claims, and whether the plaintiffs, if they offer to waive such damages, are in conflict with the interests of the putative class members. Defendants argue that plaintiffs have not properly waived liquidated damages.

5. Whether the Court should dismiss the Complaint based on the sixty (60) hour workweek guaranteed salary exemption to the FLSA overtime provisions (29 U.S.C. § 207(f))?

6. Whether the Court should dismiss the complaint based on the DOL's determination letter finding that the defendants were eligible for the taxicab exemption?

## ARGUMENT

## POINT ONE

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED

### A.   The Size Of The Potential Class, Twenty Seven (27), Does Not Satisfy The Numerosity Requirement Of FRCP 23(A)(1).

The numerosity requirement under FRCP Rule 23(a)(1) is presumed when a class reaches a level of 40 members. See <u>Consolidated Rail Corp. v. Town of New Hyde Park</u>, 47 F.3d. 473, 483 (2d Cir. 1995); See <u>Nobel v. 91 University Place Corp.</u>, 224 F.R.D. 330, 337 (S.D.N.Y. 2004). (Generally, a class composed of more than forty members satisfies the numerosity requirement").

Plaintiffs have only submitted the consent to opt in forms for twenty-seven (27) plaintiffs including the six (6) named plaintiffs. The record shows that on May 24, 2004 the six (6) named plaintiffs filed the consent forms. (Docket #36 at Ex. "N").[3] On May 27, 2004, three (3) other potential plaintiffs filed consent forms. (Docket #38 at Ex. "N"). On June 9, 2004, six (6) more potential plaintiffs filed consent forms. (Docket #40 and #41 at Ex. "N"). On June 14, 2004 two (2) more potential plaintiffs filed consent forms. (Docket #42 at Ex. "N"). On June 23, 2004 four (4) more potential plaintiffs filed consent forms. On July 1, 2004 ten (10) more potential plaintiffs filed consent forms, bringing the total potential class to 30.

Of this initial group, three cannot qualify as drivers. James Tisdale and

---

[3] Unless otherwise noted, all exhibits are annexed to the Hopkins Affirmation submitted herewith with Defendants' Reply papers.

Santos Quinones are helpers and Jeffrey Ferguson is a dispatcher. Therefore, the group at the time of the court-order date of July 15, 2004 marking the close of filing consent forms consisted of twenty-seven (27) class members. See list of 27 at Ex. "O" annexed to Hopkins Aff.

Plaintiffs have argued that "Defendants payroll records themselves demonstrate that the putative class consists of at least ninety (90) present and former ambullete drivers". See Plaintiffs' Memorandum of Law in Further Support of Plaintiffs' Motion at p. 4.[4] However, defendants have demonstrated that the Ennis Report (plaintiffs' accountant's report) was defective and unreliable in the format presented. Defendants have pointed out that the Ennis Report is based upon payroll records, but an interpretation that is defective and unreliable.

Further, in their Memorandum of Law, plaintiffs did not respond to defendants' claim that only 27 potential class members have consented to opt in. This number falls far short of 40 required for purposes of certification; it fails by over 30% to meet the required number of 40. Therefore, defendants submit that plaintiffs fail to meet the numerosity requirement and thus fail to comply with FRCP 223(a)(1).

Plaintiffs have disputed to defendants' counsel count and insisted that there are nine (9) other potential plaintiffs, in that they allegedly completed and filed consent to opt in forms. However, there is no proof that these consent forms

---

[4] We cite to Plaintiffs' Memorandum of Law hereinafter as "Plaintiffs' Mem. Of Law ___".

were filed. In fact, in a letter to the court dated October 26, 2004, plaintiffs requested that the court accept the consent form of one Tyrone Ladson whose envelope was post marked October 14, 2004, nearly three (3) full months after the closing date to file the form with the Court. In any event, only twenty-seven (27) plaintiffs have consented to opt into the lawsuit.

## B.   The Issue Of Damages Predominates; Plaintiffs' Claims Do Not Satisfy The Commonalty And Typicality Requirements.

Defendants have addressed the question whether plaintiffs have satisfied the commonality and typicality requirements of FRCP 23(a). See Defendants Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment at pp. 9-12 (hereinafter "Defendants' Mem. of Law")

As stated in defendants' conclusion in the Mem. of Law at p. 12:

> The elements of each individual's claims vary considerably and are not typical of any other employee's claim. As an example, helpers are paid pursuant a wage [rate] for forty hours and then time and one half above that rate. Full-time drivers are paid a set weekly paycheck which includes the overtime calculation. Some plaintiffs, who were designated helpers and mechanics, were required to perform tasks other than driving. The plaintiffs worked different hours for different periods of time and for different compensation. Therefore the claims of the named plaintiffs cannot be "typical" of those of all class members. There is no central specific claim presented by the plaintiffs as a group, and each plaintiff has a different wage claim.

There are other facts that this Court should consider in deciding whether plaintiffs' claims satisfy the commonality and typicality requirements. See

9

Defendants' Mem. of Law at pp. 19-20.

> Rather, class certification is intended to allow a single forum to decide truly similar claims, with a minimum expenditure of time and money. The claims here are not similar. Some of the plaintiffs are present employees of the defendant Elbrus, which only recently began employing these plaintiffs, some of the plaintiffs were employees of the defendant E&L and were never employed by the defendant Elbrus. Some of the plaintiffs are former employees of Elbrus. Some are drivers, some helpers, some dispatchers and mechanics. Each of these classifications is covered by a different wage clause in the collective bargaining agreement between the Union and E&L. Elbrus, upon information and belief, never signed an agreement regarding their employees' wages. This case palpably fails to demonstrate the plaintiffs are similarly situated, have similar claims, and are governed by similar employment conditions as each other and as the class of employees they seek to represent. Accordingly, this Court should deny class certification.

## C.   The Court Should Require That Plaintiffs Arbitrate Their Overtime Claims.

Defendants raised the question whether the plaintiffs' claims should have gone to arbitration. See Defendants' Mem. of Law at pp. 10-11.

Defendants submit that during the three year period of the CBA there never was any grievance filed by the drivers about the overtime issue. Only when the parties began to negotiate a new CBA in 2001, did the issue concerning overtime arise. Defendants submit that if class certification is denied, since the number of putative class members is only 27, the issue of overtime can be addressed before an arbitrator.

## D.   Plaintiffs May Not And Their Counsel May Not Adequately Represent The Proposed Class.

Defendants addressed these issues in their Mem. of Law at pp. 13-18. Defendants believe that the arguments presented at that time are meritorious. Further, there are additional reasons why the named plaintiffs do not represent the proposed class and why counsel can not adequately represent the proposed class.

### 1.   The Putative Plaintiffs Have Not Demonstrated The Financial Wherewithal To Assume Financial Burden Of A Class Action.

Plaintiffs refer the Court to the FLSA Consent Notices but do not proffer evidence of the consent form to support their argument that the plaintiffs do not have to assume any financial burden to prosecute the state claims; that the law firm will finance the litigation. Therefore, this issue is not settled.

### 2.   Defendants Have Pointed Out The Fallibilities Of Plaintiffs' Counsel.

In addition to the reasons previously explained in Defendants' Mem. of Law at pp. 17-18, defendants pointed to the poor quality of the Ennis Report which is the underpinning of plaintiffs' claims. The Ennis Report is teeming with errors on every page, including baseless assumptions, incorrect conclusions, no explanations of the methods of calculations and no notations whatsoever of any exceptions to the calculations. The Report by Ennis is a poor mathematical product and sad piece of accounting.

Further, plaintiffs in their reply papers to their motion for partial summary

11

judgment do not address any of the problems raised by defendants when they attacked the conclusions and calculations in the Ennis Report.

Defendants submit that the Ennis Report was poorly supervised, poorly organized, and faultily interpreted, all responsibilities of which belong to the attorneys for plaintiffs, not just their accountants. It is quite noticeable that plaintiffs' counsel themselves acknowledged no responsibility, and offered no defenses to the numerous arguments made by defendants about the defective Ennis Report. The plaintiffs' lawyers avoided mentioning the Report in any positive light at all. How could they? But the Ennis Report is their grounds or proof of claims. The Report fails.

Plaintiffs cite Smellie v. Mount Sinai Hospital, 2004 WL 2725124 at *6 (S.D.N.Y. 2004). Plaintiffs' counsel state that they have demonstrated that "They (a) are knowledgeable of the applicable law and (b) have been diligent in identifying and investigating potential claims in this action, and (c) have devoted substantial resources to represent the class". But the proof is in the pudding. There's the matter of the Ennis Report and its poor quality. Further, plaintiffs claim to have 40 potential clients. But they failed to timely file 9 consent forms. They filed forms for three (3) employees who were not drivers and they simply can not do math. When the dust settled, there were only 27 potential plaintiffs standing on the steps to Shapiro Beilly.

Plaintiffs cite Smellie (no pun intended, they tell us) for the support of their qualification as counsel to the class. The Court in Smellie reviewed the

12

curriculum vitae annexed to the motion. In the instant case, neither Mr. Levy nor Mr. Kandel have submitted his curriculum vitae in support of the application. Smellie discusses the court's own observations of what the lawyers' resumes claimed and why lawyers were qualified to represent the class.

We can only point to the work that has been done thus far in this case which work we believe does not demonstrate that plaintiffs' counsel can adequately represent the proposed class. Nor has plaintiffs' counsel explained the resources that they are able to commit to representing the class.

Plaintiffs also cite Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002). ("In determining the adequacy of counsel, the court ... examines counsel's competence displayed by present performance"). That being said and being the rule, counsel's present performance in the instant matter seems inadequate and their application to represent the proposed class should be denied by this Court.

## E.  Plaintiffs Still Have Not Waived Their Claims For Liquidated Damages.

Defendants previously demonstrated the plaintiffs had not waived their claims for liquidated damages. See Defendants' Mem. of Law at pp. 20-21.

However, in their opposition papers (Plaintiffs' Mem. of Law at pp. 9-10), plaintiffs submit that they finally have waived liquidated damages:

> In his Supplemental Declaration, Mr. Mascol once again makes it abundantly clear that "In the event that the Court certifies Plaintiffs' New York State overtime claim, I would note that I have spoken to the other named lead

13

> Plaintiffs in this litigation, and on behalf of myself as
> well as the other named lead Plaintiffs, we are prepared
> to waive Plaintiffs' claim for liquidated damages".

Defendants submit that it's not "abundantly clear" yet that plaintiffs have

legally waived liquidated damages. All of the named plaintiff filed declarations

executed on or about December 9, 2004 with the opposition papers. Only Mr.

Mascol speaks about a waiver. None of the other five (5) named plaintiffs

mentioned the fact that they also would waive the liquidated damages claim. Nor

do the other five (5) named plaintiffs confirm that they discussed this issue with

Mr. Mascol and asked him to represent their interest, act on their behalf, and to

state that they "are prepared to waive Plaintiffs' claim for liquidated damages".

Plaintiffs, these five anyway, have made no commitment and have not waived the

damages.

Questions about the express waiver abound. Clearly, there is not an express

waiver yet, nor do all six (6) named plaintiffs make the same statement abut

being "prepared to waive Plaintiff's claim for liquidated damages".

Therefore, defendants submit that since the plaintiffs still have not

expressly waived their liquidated damages claim, the Court should deny plaintiffs

application to certify the class.

## POINT TWO

## DEFENDANTS ARE ENTITLED TO AN ORDER DISMISSING THE COMPLAINT

### A. Defendants Are Subject To The "Taxicab Exemption"

The Portal Act was designed to protect employers from liability if they took certain actions on the basis on an interpretation of the law by a government agency, even if the agency's interpretation later turned out to be wrong. 29 U.S.C. § 259. Section 10(a) of the Portal Act, provides that "an employer shall not be subject to any liability ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on" a written ruling or interpretation of an appropriate government officer. Thus the Portal Act defense requires the employer to establish three interrelated elements: (1) that its action was taken in reliance on a ruling of the agency, (2) that it was in conformity with that ruling, and (3) that it acted in good faith in relying on the ruling. EEOC v. Home Ins. Co., 672 F.2d 252, 263 (2d Cir. 1982).

Defendants submit that they are exempt from FLSA's overtime requirements because they fall within the statute's "taxicab" exemption. See 29 U.S.C. § 213(b)(17). Defendants rely upon a determination of the Wage and Hour Division of the Employment Standards Administration of the U.S. Department of Labor. The determination was dated February 20, 1996 and signed by Doreen L. Sinclair. The letter states in pertinent part, as follows:

> This letter is to inform you of the conclusion of our investigation of your establishment under The Fair

15

Labor Standards Act.

Our investigation has disclosed no apparent violations of the FLSA. We believe your firm to be exempt from OT [overtime] under FLSA Reg. section 13(b) 17 ... taxicab.

See first Kryzhanovsky Aff. of October 22, 2004 at Exhibit "H".

Defendants submit that the DOL determination of 1996, having determined that the business was eligible for the exemption, also approved the method of compensating full time drivers who were working sixty (60) hour workweeks. Ely Matalon was the owner of the business in 1996. When the employees formed a union and negotiated a Collective Bargaining Agreement ("CBA") with the defendants, the salary structure which had been implicitly approved by the DOL, was incorporated into the CBA. After the CBA expired on December 31, 2001, the defendants continued to pay wages in accordance with the CBA. Only until October 2004, after litigation ensued with the filing of the instant motion, did defendants change the salary structure to a new system.

Defendants submit that they can demonstrate satisfaction of the three elements required for the defense under § 10 of the Portal Act.

First, the action of the employer, for which it seeks to escape liability by virtue of the Portal Act, must have been taken in reliance on the administrative ruling or interpretation. See EEOC v. Home Ins. Co., at 264. Defendants underwent an investigation of their business, including the examination of the sixty (60) hour workweek and how employees were paid using a basic hourly rate and an overtime rate for the workweek. The Wage and Hours Division found that

16

the business qualified for the taxicab exemption. Defendants relied on the determination letter dated February 20, 1996 and continued to compensate the regular full time drivers in accordance with the practice used at the time of the DOL ruling. This practice was memorialized in the CBA negotiated effective January 1, 1999.

As to the second element, assuming that as a technical matter, defendants can rely on the DOL determination letter and the regulation, defendants' actions must have been "in conformity with" the ruling or interpretation. See EEOC v. Home Ins. Co., at 265. Defendants have continued to compensate the regular full time drivers using the same methods of calculating the overtime rate for all experience levels. The business has continued to operate and performs the same services since February 20, 1996 in accordance with the ruling that the business was exempt from the FLSA overtime rules because it qualifies for the taxicab exemption. The defendants have continued to comply with all rules and regulations of the New York City Taxi and Limousine Commission and the New York State Department of Health regarding the operation of their business. See application for Medicaid License at Exhibit "E" of Hopkins Aff.

The third and final element that an employer must establish in order to prove a Portal Act defense is that its conformance with the administration ruling or interpretation was in good faith. This is not a requirement of a showing of general good faith; the Portal Act language, "in good faith in conformity with", precisely links the question of good faith to an act in conformity, and if there is no

17

conformity, general good faith in other respects cannot save the day. See EEOC v. Home Ins. Co., at 265.

Defendants submit that they have conducted the business in conformity with the requirements for eligibility pursuant to the taxicab exemption. When defendants negotiated the CBA with the regular full time drivers, who were represented by counsel throughout the negotiations, the compensation structure used since 1994, implicitly approved by DOL in 1996, was incorporated in the new CBA. Defendants had no reason to believe that they were in violation of the overtime rules of the FLSA. They had no notice of a change in the regulation or of an administrative ruling.

Upon review of the legislative history of the Portal Act, light is shed on the meaning of the third element. See Clifton D. Mayhew, Inc. v. Wirtz, 413 F.2d 658, 651 (4th Cir. 1969).

President Truman's message to Congress on his signing of the Portal Act was that § 10 was not intended to "make each employer his own judge of whether or not he has been guilty of a violation". Message of President Truman to accompany the Portal-to-Portal Act of 1947, U.S. Code Cong. & Ad. News 1827 (May 14, 1947).

The employer must meet an objective test of actual conformity with an administrative ruling or policy. If the employer avails himself of the defense under these Sections, he must bear the burden of proof. He must show that there was affirmative action by an administrative agency and that he relied upon and

18

conformed with such action. He must show further that he acted in good faith in relying upon that administrative action. (All of this has been satisfied by defendants).

"The defense of good faith is intended to apply only where an employer innocently and to his detriment, followed the law as it was laid down to him by government agencies, without notice that such interpretations were claimed to be erroneous or invalid. It is not intended that this defense shall apply where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him." Vol. 93, Part 4, Cong. Rec. 4390.

Defendants submit that under the facts and circumstances of this matter, and upon the testimony of Ely Matalon, the former owner (from 1994 until 2001), and Leon Kryzhanovsky, also a former owner (from 2001 to 2004), that the defendants have acted in good faith in conformity with and in reliance on the 1996 DOL determination. Defendants acted innocently and to their own detriment, without any grievances from employees, without any opposition from the union's legal counsel since late 1998 when they were negotiating the CBA, wherein the structure for overtime was memorialized and agreed upon. Defendants have followed the law as it has been explained to them and approved by the DOL in February 1996. Defendants did not have knowledge of any conflicting laws until the drivers' union was placed into trusteeship, new labor counsel was hired, and upon failure to negotiate a CBA, the drivers' current labor counsel filed the instant lawsuit for underpayment of wages. For the reasons

explained above, this Court should permit defendants to use the Portal Act defense.

## 1. The Wage and Hour Division's Opinion Letter of April 17, 1998.

Defendants submit that the Opinion Letter of April 17, 1998 does not expressly invalidate the substance and effect of the DOL Wage and Hours Division Determination dated February 20, 1996.

Generally, the Department of Labor will answer inquiries from individuals or organizations affected directly or indirectly by FLSA as to their status under the Act or as to the effects of certain acts and transactions. An Opinion Letter is a written statement issued to an individual or organization, ... that interprets and applies the Act to a specific factual situation.

The DOL has authoritatively addressed the function and finality which it will place on opinion letters.

Advisory interpretations announced by the Administrator [of the Wage and Hour Division] serve only to indicate the construction of the law which will guide the Administrator in the performance of his administrative duties unless he is directed otherwise by the authoritative ruling of the courts, or unless he shall subsequently decide that his prior interpretation is incorrect. Advisory interpretations announced by the Administrator, 29 C.F.R. § 775.1. Opinion letters are rulings "made by an agency 'as a consequence of individual requests for rulings upon particular questions.' " 29 C.F.R. § 790.17(d).

Advisory opinions issued by the Wage and Hour Administrator are to guide

the DOL in its operations. They are neither final nor binding on employers or employees. Rather they are expressly issued subject to change by the Administrator.

In an enforcement action, the Portal-to-Portal Pay Act, 29 U.S.C. § 251 et seq., allows the defense of good faith reliance on "any written administrative regulation, order, ruling, approval, or interpretation," of the DOL. 29 U.S.C. § 259. Such a defense is a bar to the enforcement action, even if the DOL were to later change its position announced in the administrative regulation, order, ruling, approval, or interpretation. 29 U.S.C. § 259(a). The regulations, however, explain that reliance on an opinion letter is not valid for any period after the Administrator has announced a change in policy. 29 C.F.R. § 790.17(h)-(i) (1990). Thus, opinion letters have only an interim function which is subject to amendment or withdrawal by the Administrator. Taylor-Callahan-Coleman Counties Dist. Adult Probation Dept. v. Dole, 948 F.2d 953, 957 (5th Cir. 1991).

Rather than constituting agency action which is definitive, broadly applicable and demanding of compliance by all employers ..., the letters involved here state only that they respond to particularized inquiries. Since the opinions are intended to guide DOL officials in similar situations, they surely are carefully reasoned. Nevertheless it is the regulations, not the opinion letters, which fix rights. Taylor-Callahan-Coleman at 958.

In the April 19, 1998 letter, submitted by plaintiffs in their Mem. of Law,

Daniel F. Sweeney, author of the letter, states:

> "This opinion is based exclusively on the facts and
> circumstances described in your request and is given on
> the basis of your representation, explicit or implied, that
> you have provided a full and fair description of all the
> facts and circumstances that would be pertinent to our
> consideration of the question presented. Existence of
> any other factual or historical background not contained
> in your letter might require a different conclusion that
> the one expressed herein".

Therefore, the effect of the April 19, 1998 letter is quite limited. It certainly

has no binding legal effect on the instant matter. It only shows what the DOL

thinks with respect to a specific set of facts and circumstances. It is quite different

from the February 20, 1996 Determination Letter from the DOL which was

written upon conclusion of an investigation. Certainly, defendants submit, the

April 17, 1998 letter cannot invalidate the February 20, 1996 determination.

As the Department of Labor has written, Opinion Letters have effect only

on the parties and situation described in the request. These parties may rely on

the opinion only to the extent that the request fully and accurately described all of

the material facts and representations necessary to the issuance of the opinion,

and the situation conforms to the situation described in the request for the

opinion. See ERISA Proc. 76-1 § 10, 41 Fed. Reg. at 36, 283.

Therefore, defendant respectfully requests that the Court find that the

April 18, 1998 Opinion Letter does not expressly invalidate the DOL

determination letter of February 20, 1996.

22

## 2. The DOL Determination Letter of February 20, 1996 is not invalidated by Herman v. Brewah Cab.

Plaintiffs argue that the decision of the district court Herman v. Brewah Cab, Inc., 992 F. Supp. 1054 (E.D. Wis. 1998) invalidates the DOL Determination letter of February 20, 1996. Defendants disagree with this conclusion since Brewah Cab is easily distinguishable from the instant matter.

Plaintiffs further argue that because of Brewah Cab, a 1998 lower court decision in Milwaukee County, Wisconsin, that defendants cannot invoke the Portal Act's "good faith" defense. Plaintiffs do not explain their reasoning for this conclusion. Defendants submit that the Brewah Cab decision should not adversely impact upon their good faith defense since they had no knowledge of this lower court's decision. Since the union had the same legal counsel, from 1998 through 2003, when the current lawyers for plaintiffs were retained to negotiate for the union, and since there is no evidence that the issue about overtime payments were grieved, the burden should be placed on plaintiffs to prove that defendants had an awareness of the apparent legal conflict in interpreting the eligibility for the taxicab exemption.

At the top of their argument, plaintiffs insert that the facts in Brewah Cab are "virtually identical" to those presented in the instant matter. Defendants concede that there are some similarities but submit that the factual differences are several and significant.

First, the Secretary of Labor, the plaintiff in Brewah Cab alleged that the

employer failed to keep accurate records of wages and hours employees worked. In the instant case, there were no such allegations by the DOL. The record keeping of defendants is excellent and thorough. In the instant case, any sloppiness about the bookkeeping goes to only the gross miscalculations of compensation by legal counsel and their accountants. As previously described above, the assumptions, the interpretations and the conclusions are inaccurate and incorrect. The Ennis Report needs to be completely reworked; it's not worth the paper that it's printed on.

Second, defendants request that the Court recognize that defendants in Brewah Cab did not assert the Portal Act defense. In the instant case, defendants assert the Portal Act defense in reliance upon the February 1996 Determination Letter of the DOL Wages and Hours Division.

Third, the facts of Brewah Cab are quite different from the instant case.

In Brewah Cab, the Wage and Hour division conducted an investigation for compliance with FLSA, which covered a two year period from May 1993 though May 1995. As a result of the DOL investigation, the defendants conducted a self-audit in July 1995 under the direction and supervision of the DOL. The audit revealed that from May 1993 through May 1994, defendants only paid overtime for hours in excess of 80 in a two-week compensation period. Defendants did not pay overtime for hours worked over 40 in a workweek if the hours did not exceed 80 in a two week period. Beginning in March 1994, the defendants paid overtime compensation at 1 ½ times the regular wage rate for hours worked in excess of

24

80 hours up to 100 hours. For a two-month period, March 1994 through May 1994, when hours exceeded 100 in a two-week compensation period, employees were paid at the straight regular rate of pay for those excess hours instead of a 1 ½ times the regular rage. In July 1995, during the defendants' self-audit period, the defendants converted to paying overtime for all hours in excess of 40 hours in a work week at 1 ½ times the regular rate of pay. Simply put, there were significant overtime issues.

On April 26, 1996, the Secretary of Labor sued for recovery of unpaid back wages. Defendants asserted, as an affirmative defense, that they were exempt from the overtime provisions of the FLSA because the business was a taxi company under 29 U.S.C. § 213(b)(17).

Comparing the investigations of the Brewah Cab case and the instant case yields important conclusions; First, the DOL approved the operations of E & L and granted them an exemption under the taxicab exemption. The DOL in Milwaukee County did not grant the taxicab exemption to Brewah Cab and demanded payment of all overtime backpay for the drivers. Secondly, both DOL investigations took place during 1995 and covered a similar time period. The investigations were conducted by different DOL regional offices. In Brewah Cab, the DOL denied the taxicab exemption and found that overtime had not been paid. When Brewah Cab refused to pay the backpay, the Secretary of Labor filed a lawsuit to recover the backpay.

In the investigation of defendant Community Transportation, the DOL

25

apparently found no overtime violations and determined that defendants were entitled to the taxicab exemption. Therefore, Brewah Cab is very much distinguishable from the instant matter.

In Brewah Cab, the district court said, "It is true that defendants' business has some attributes in common with a typical taxicab company. For instance, the defendants' business does not operate over fixed routes, it posts its rates of fare in each vehicle, and the company allows the passenger to determine the destination of the vehicle". Brewah Cab at 1059. All of these facts save one – the posting of rates in each vehicle – are the same in the instant matter. E & L does not operate over fixed routes, and it allows its passengers to determine the destination of the vehicle.

The district court in Brewah Cab also said, "The unique characteristics of the defendants' operation are exactly the factors that this Court must consider in determining whether its operation was contemplated by Congress ...". Brewah Cab, at 1060. Defendants submit that this Court need not review the unique characteristics of the instant matter since the DOL in 1996 conducted an investigation and determined that the unique characteristics of defendants' operation qualified it for the taxicab exemption.

In any event, upon a comparison of the following facts, defendants submit that the instant case is further distinguishable from Brewah Cab:

26

## **Brewah Cab**

1. not permitted to pick up passenger who have not prearranged services

2. not allowed to wait for passengers at home or destinations

3. tipping not allowed

4. advertise in yellow pages as "transportation services for the disabled"

5. drivers are permanently assigned vehicles and can take them home but cannot use for personal business

6. rates determined by company based on mileage; rates are posted

7. co-pay of costs by passenger

8. licensed by City of Milwaukee licensing division as handicapped – elderly handicapped services

9. drivers also worked as mechanics on their vans

10. clientele has generally handicapping conditions; require a special kind of "taxi" service

11. does not have a taxi or livery license

## **Community Transportation**

1. can pickup passengers who do not have prearrangements

2. can wait 30-45 minutes

3. tipping is permitted

4. do not advertise in yellow pages

5. same as Brewah Cab

6. rates determined by N.Y.S. Dept. of Health; numerous categories and rates for different services; however, not posted in vehicle

7. no co-payment; however 5% of all rides are private and passenger pays 100%

8. licensed by New York City Taxi and Limousine Commission

9. drivers only drive; there is a separate mechanic employee to repairs the vans

10. serves similar population which requires a unique kind of "taxi" service

11. has obtained a "livery" license; displays a special license with "diamond" TLC marking

27

Therefore, defendants submit that if the Court chooses to examine the unique characteristics of defendants' company, it should confirm the DOL's determination that defendants' business qualifies for the taxicab exemption and is not subject to the overtime provision of the FLSA.

## B.   **Defendants Have Met Their Burden**

The burden on plaintiffs is as follows "[A]n employee has carried out his burden [of production under the FLSA] if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work by just and reasonable inference". Lin v. Jen Chu Fashion Corp., 2004 WL 33412 at *3 (S.D.N.Y. 2004). See Grochowski v. Phoenix Constr., 318 F.3d 80, 87-88 (2d Cir. 2003). Defendants submit that while plaintiffs have submitted pay check stubs for time worked, they have not met their burden that they were improperly compensated. They have not explained how they calculated that they were improperly compensated. Defendants also submit that plaintiffs presented the Ennis Report which grossly miscalculated wages, made incorrect assumptions, interpretations, and drew wrong conclusions as a result.

Assuming arguendo, that plaintiffs have met their burden, the burden then shifts to the employers/defendants to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. Liu v. Jen Chu Fashion Corp., at *3. Defendants submit that they have met this burden by providing

28

testimony of the former owner, Ely Matalon, the subsequent owner Leon Kryzhanovsky, documentary evidence in the form of books and records, the DOL Determination Letter of February 1996, the CBA, including an explanation of how the documents support defendants' argument that they were in full compliance with the FLSA.

At page 19 of their Reply Memorandum of Law, plaintiffs rely on the regulation of 29 C.F.R. § 516.2(a), slicing and dicing the regulation to fit their argument. Their reliance is wrongly placed for the following reasons.

First, pursuant to 29 C.F.R. 516.12, for employees exempt from the overtime pay requirement pursuant to section 13(b)(17) of the Act, ... [the employer] shall maintain and preserve payroll or other records, containing all the information and data required by 516(a) except paragraph (a)(6) and (9) and in addition, information and data regarding the basis on which wages are paid (such as the monetary amount paid, expressed as earnings per hour, per day, per week, etc.).

Therefore, assuming arguendo, that the drivers are exempt from overtime rules under the taxicab exemption, the employers do not have to comply with 516.2(a)(6) and (9). These sections state the following information is required:

> (6) (i) Regular hourly rate of pay for any workweek in which overtime compensation is due under section 7(a) of the Act, (ii) explain basis of pay by indicating the monetary amount paid on a per hour, per day, per week, per piece, commission on sales, or other basis, and (iii) the amount and nature of each payment which, pursuant to section 7(e) of the Act, is excluded from the

29

> "regular rate" (these records may be in the form of
> vouchers or other payment data),
>
> (9) Total premium pay for overtime hours. This amount
> excludes the straight-time earning for overtime hours
> recorded under paragraph (a)(8) of this section.

In short, defendants were not required to state the regular hourly rate of pay in which overtime compensation is due. Nor did defendants have to record the total premium pay for overtime hours.

Plaintiffs cite <u>Jacobson v. The Stop and Shop Supermarket Co.</u>, 2003 WL 21136309 at *3 (S.D.N.Y. 2003). The case does not discuss the taxicab exemption or 29 C.F.R. 516.12 (which covers a host of § 213 (b) exemptions). If plaintiffs had read <u>Jacobson</u> they would have realized that many exemptions allow employers leeway to handle the requirements of 29 C.F.R. 516 (a)(6) and (9). <u>Jacobson</u> notes the exemptions but decides the issues on grounds based upon another type of FLSA exemption.

At page 20 of their Mem. of Law, plaintiffs state that "... The payroll records failed to delineate the regular hourly rate of pay or overtime rate of pay for any workweek in which overtime compensation would be due". But this method of record keeping is permitted under the regulations. The drivers were exempt and the overtime rate of pay did not have to be delineated. However, the fact, bourne out by the testimony of both Kryzhanovsky and Matalon, is that there was a basic hourly rate and an overtime rate of pay 150% of the basic hourly rate. Plaintiffs have completely misinterpreted the federal regulations as the

relevant regulations should be applied to this case. Therefore, in contrast to plaintiffs' incorrect legal conclusions, defendants have rebutted plaintiffs' evidence as a matter of law.

## 1. The Kryzhanovsky Affidavit Explains The Calculations And Demonstrates That There Are No FLSA Violations.

As Kryzhanovsky has stated in his Reply Affidavit, the payroll records consistently show the following information in the Supplemental Declaration of Kurt Washington:

1. Exhibit "A" of Declaration of Washington dated 12/9/04:

> (a) Here the driver worked a total of 62.5 hours for the week. The "pay rate" column shows the guaranteed weekly salary of $575.00 (listed as reg-pay).
>
> (b) Also in the "pay rate" column is a figure of $14.37. On the same line under the "Reg. Hours" column is 2.50 hours. Continuing on the same line under the "Earnings" column is the notation "RG-3" and a total of $35.92 earned for the "bonus overtime".
>
> (c) There are no notations under the "O.T. Hours" column.
>
> (d) Washington earned gross pay of $610.92.

2. Exhibit "B" of Declaration of Washington dated 12/9/04:

> (a) Here, Washington did not work a 60 hour week. He worked 53.25 hours. Had he worked 60 hours, he would

31

have been paid $575.00.

(b)     Here, there is an error in the calculations of the pay rate. There was a bookkeeping error: the pay rate should have been $9.58, not $9.50.

(c)     A driver who was paid $575 a week was normally paid $8.21 for the first 40 hours and $12.30 for the next 20 hours.

(d)     If the driver worked less than 60 hours, the calculation for gross pay was based on the number of hours less than 60 hours multiplied by the pay rate of $9.58.

(e)     To calculate the gross pay, since Washington worked 6.75 hours less than 60 hours, $64.67 should have been subtracted from $575.00 for a gross pay of $510.33.

(f)     As a result of the bookkeeping error of 8 cents per hour, there is a small error of approximately $4.26.

3. Exhibit "C" of Declaration of Washington dated 12/9/04.

(a)     Most of these paystubs show the error in the simplified pay rate of $9.58. Only Washington made $575 for the sixty (60) hour workweek.

At page 21 of subpart "A" of Plaintiffs' Mem. of Law in opposition to the Defendants Cross-Motion, plaintiffs refer to Exhibit "K" of the Kryzhanovksy Aff. A review of the quarterly payroll records for week ending 8/10/01 shows that

32

Washington was properly compensated. Defendants always used the basic formula (basic hourly rate times 40 hours; then the overtime rate for the next 20 hours of work). Washington was paid $7.50 for the first 40 hours and 11.25 for the next 20 hours. If you multiply $7.50 times 40 hours, you get $300 for the first 40 hours. When you multiply 7.25 hours times $11.25, the total is 81.56. This would produce a gross pay of $386.56, less than what he was actually paid. Instead of reducing the weekly pay by the overtime factor of $11.25 x the number of hours not worked, defendants reduced the amount by $8.75 x 12.75 hours for a result of $111.56. If you subtract $111.56 from $525.00, the gross pay corresponds to $413.43. If effect, the drivers were paid at a rate of pay higher than if they were paid the overtime rate of $11.25 because of the method used to calculate the gross pay. (The hours worked less than 60 were multiplied by the "bookkeeping pay rate figure" which was subtracted from the usual total salary for 60 hours of work).

At page 21 subpart "B" of the plaintiffs' Mem. of Law, plaintiffs refer to Exhibit "K" of Kryzhanovsky Aff. for the payroll of the well week ending 3/22/02. Defendants can explain how the driver was paid. Again, plaintiffs' calculations are wrong. For the 54 hours worked, Washington was paid $494.64. This calculation resulted from multiplying the number of hours worked less than 60 (which is 6 hours) and multiplying 6 hours by $9.16 an hour. This produced a reduction of $54.96 for the gross pay of $445.04 (the 40¢ error is due to the accounting used, i.e., $9.16 rather than the exact amount of $9.16.666 repeating

33

decimal – which is $550 divided by 60. If the driver was paid the basic rate of $7.85 for 40 hours (resulting in $314.00) and 11.77 times 14 hours (resulting in overtime pay of $164.78) producing a gross salary of $478.78, this would have been less than what he was actually paid $494.64. The driver was overpaid. As explained above, on account of the guaranteed contract, E & L subtracted the number of hours that the driver should have worked minus the unexcused hours not worked by the "bookkeepers pay rate" indicated on the payroll stub.

Finally, at footnote 10 of Plaintiff's Mem. of Law, plaintiffs state that "inconsistencies apply to each and every employee". Plaintiffs make a blanket statement and proffer no proof. Defendants submit that this is not the case. The Ennis Report submitted by plaintiffs' accountants was put together so poorly that the court should direct plaintiffs to revise the document to reflect the evidence in both the weekly payroll records and quarterly payroll records. Plaintiffs have muddied the waters terribly. The result is that plaintiffs' purported evidence is not an accurate interpretation of the books and records of the defendants.

## 2. The Pay Stubs Do Not Demonstrate That Defendants Failed To Pay Overtime; In Fact, Defendants Paid Overtime Although They Operated Under The Taxicab Exemption.

Plaintiffs cite Mach v. United States, 814 F.2d 120, 124 (2d Cir. 1987) for the rule of law that a party cannot submit an affidavit on summary judgment to seek to have the Court contradict or reject prior testimony. Plaintiffs also cite Fordham v. The Salvation Army, 2004 WL 1769809 at *3 (S.D.N.Y. 2004) for the same principle.

34

Both cases do not support plaintiffs' argument since, unlike <u>Mack</u> and <u>Fordham</u>, there has been no prior deposition testimony in the instant case. In both <u>Mack</u> and <u>Fordham</u>, the plaintiff submitted an affidavit in opposition to a summary judgment motion. Each affidavit contradicted certain statements made by the plaintiff in a prior deposition. None of the Defendants have been deposed yet. Plaintiffs are twisting the facts once again. Defendants, in an affidavit by Kryzhanovsky, have attempted to explain both the quarterly payroll records and the individual weekly paycheck stubs. The payroll records are not equivalent to deposition testimony. Defendants' first and only chance to explain the facts has been the affidavits that have been submitted in the instant motion. Therefore, defendants submit that they have not submitted any affidavits which contradict or reject any prior deposition testimony. Defendants' affidavits have attempted to explain the payroll documents.

### 3. The Defendants Can Rely On The Terms Of The Collective Bargaining Agreement.

Defendants have explained and testified at length that the regular full time drivers were paid overtime at 150% of the basic hourly rate. Defendants have addressed all of the issues discussed in Article 24: Wages of the CBA.

Defendants have testified that drivers who work fewer than 60 hours are not considered regular full time drivers. Defendants, pursuant to contract, pay them $7.50 per hour. It is the testimony of Kryzhanovsky and Matalon that this category of employee refers to those workers who work under 40 hours per week.

The hourly rate feature was set for employees who work not full-time drivers; most of the employees referred to in Article 24.2 of the CBA never worked 40 hours – the pay seems higher than the "basic hourly rate" used for regular drivers because these drivers were filling in the gaps or working as replacements and/or substitutes.

Finally, plaintiffs rely on a legal rule: language contained within the expired collective bargaining agreement is not sufficiently express to create such an arrangement (supposedly that an overtime component is included within the total weekly salary paid to employees). Miles v. Kwon, 284 F. Supp 2d 201, 233 (S.D.N.Y. 201). Unlike the facts and circumstances of the instant case, there the Court said "... [T]here is no evidence to support a finding that the parties intended and understood the meals and lodging provided to Moon as compensation for overtime – rather, these benefits were simply part of Moon's regular salary, just as the cash and checks he received every week were part of that salary. The Moon decision referred to Giles v. City of New York, 41 F. Supp 2d 308, 317 (S.D.N.Y. 1999) ("unless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salaries covers only the first 40 hours). Defendants have demonstrated that the formula included an overtime rate.

No complaints, pursuant to the CBA's grievance procedure, were ever filed

by any drivers until negotiations failed or went to impasse in October 2004. The CBA speaks about the overtime component of the salary paid to regular full-time drivers who work sixty (60) hour workweeks. Both principals of the corporate defendants have testified about the salary structure since the original business was put into operation in 1994. (See Matalon and Kryzhanovsky affidavits).

[A] wage plan is not rendered invalid simply because, instead of stating directly an hourly rate of pay in an amount consistent with statutory requirements, the parties have seem fit to stipulate a weekly wage inclusive of regular and overtime compensation for a workweek in excess of 40 hours and have provided a formula whereby the appropriate hourly rate may be derived therefrom. The critical questions ... are whether the hourly rate derived form the formula ... was in fact, the "regular rate" of pay within the statutory meaning and whether the wage agreement under consideration, in fact, made adequate provision for overtime compensation. Adams v. Dep't of Juvenile Justice of the City of New York, 143 F.3d 61, 67-68 (2d Cir. 1998).

Defendants submit that plaintiffs' argument in subpart 4 of Section B of their Mem. of Law holds no water at all. Only the questions about the hourly rate on the paycheck seem to confuse and cloud the issue. Kryzhanovksy has attempted to answer the apparent inconsistencies in his two affidavits. There is a history of paying regular full-time drivers in this business since 1994 a formula for a 60 hour workweek that includes a basic rate.[5] There is also documentation

---

[5] 29 C.F.R. 778.309 states "where an employee works a regular fixed number of hours in excess of the

of payments of a "super overtime" or "bonus overtime" for time worked above 60

hours in a workweek.

---

statutory maximum each workweek, it is, of course, proper to pay him, in addition to his compensation for his overtime work, determined by multiplying his overtime rate by the number of overtime hours regularly worked".

## POINT THREE

## SINCE 1994, DEFENDANTS HAVE CONTRACTED WITH DRIVERS TO PROVIDE A GUARANTEED 60 HOUR WORKWEEK

Pursuant to 29 U.S.C. 207(f) "No employee shall be deemed to have violated subsection (a) [The overtime provisions] by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under subsection (a) if such employee is employed pursuant to a bonafide individual contract, or pursuant to an agreement made as a result of a collective bargaining by representatives of employees, if the duties of such employee necessitates irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate ... and compensation at not less than one and one-half times such rate for all hours worked in excess of such maximum workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified". Since 1994 defendants have contracted with their employees who are full time drivers to work a sixty (60) hour workweek for a guaranteed salary.[6] For any work done beyond sixty (60) hours, the defendants paid a "super" or "bonus" overtime rate. (which was 150% of the overtime rate used for hours worked over 40 up to 60).

Defendants submit that the elements of a guaranteed contract under § 207 (f) and the corresponding regulations have been satisfied by them. The work to be performed was irregular in that the business had to operate for 18-20 hours per day. During the course of the day, drivers had to be available when needed. They

---

[6] The applicable regulations can be found at 29 C.F.R. § 778.406 through 29 C.F.R. § 778.414.

39

had to be on call. There was significant downtime during the shift requiring 10 to 12 hourdays as Ely Matalon has testified in his affidavit.

The policy underlying these guaranteed contracts is the "security of a regular weekly income". The hours of the duties of the drivers can vary and fluctuate on account of the needs of patients/clients to visit clinics and hospitals for medical treatment. Here, the drivers can be guaranteed pay for a regular number of hours within the meaning of § 207(f). This benefit to the employee, the Supreme Court reasoned, is a quid pro quo which serves to balance a relaxation of the statutory requirement, that any overtime work should cost the employer 50 percent more each hour. These guaranteed contracts are expressly exempt from the strict application of § 207(a).

The second element of a guaranteed contract is that payment of the guaranteed weekly salary must be made "pursuant to a bonafide individual contract or pursuant to a collective bargaining agreement. 29 C.F.R. § 778.407. the employee must not only be aware of, but must have agreed to the method of compensation in advance of the work. Ely Matalon negotiated the terms of the 60 hour workweek with each driver. He made all terms clear at the time of hire; these were oral contracts. See Matalon Aff. at Exhibit "B". He also set up company policy to reflect the guaranteed contract. However, the regulation says the contract can be oral. Matalon paid the contract salary even for weeks where drivers did not put 60 hours. There was only one exception to the guaranteed salary. If a worker had an "unexcused" absence, then he was paid 60 hours less

40

than the number of hours not excused from work.

In late 1998, Matalon negotiated a collective bargaining agreement with union representatives and the union's legal counsel. This CBA memorialized the same terms and conditions of the 60 hour guaranteed contract. It also incorporated the overtime formula.

The third element is that the contract must be "bonafide". This implies that the making of the contact and the settlement of its terms were done in good faith. 29 C.F.R. § 778.407.

Pursuant to 29 C.F.R. § 778.408, the contract must specify "a regular rate of pay of not less than the minimum wage. This is exactly the case as Matalon has testified in his two affidavits. See Exhibit "B" annexed to the Affirmation of Edward R. Hopkins. In both of the two cases on this point before it, the Supreme Court found that he relationship between the hourly rate specified in the contract and the amount guaranteed was such that the employee in a substantial portion of the workweeks worked sufficient hours to earn in excess of the guaranteed amount and in those workweeks was paid at the specified hourly rate for the first 40 hours and at time and a half such rate for hours in excess of 40. These are called Belo contracts. (Walling v. A.H. Belo Co., 316 U.S. 624 (1942) and Walling v. Halliburton Oil Well Cementing Co., 331 U.S. 17 (1947). See also McComb v. Utica Knitting Co., 164 F. 2d 670 (2d Cir. 1947). The payment of extra compensations, over and above the guaranteed amount, by way of extra premiums for work on holidays, or for extraordinary excessive work, year-end

41

bonuses which are not regularly paid as part of the employee's usual wages, will not invalidate a contract which otherwise qualifies under § 207(f).

Lastly, the fourth element is as follows. In accordance with 29 C.F.R. § 778.409, the contact must provide for payment at time and one-half (or more) for all hours in excess of the applicable maximum hours standard in any workweek. A contract may provide a specific overtime rate greater than one and one-half times the specified rate, for example, 150% of the overtime rate used for the hours #41 through #60 in the instant matter. If the contract provides a specific overtime rate it must provide that such rate will be paid for all hours worked in excess of the applicable maximum hours standard. Defendants submit that the terms of the guaranteed contract are in compliance with this regulation.

After the CBA expired in 2002, the union and management continued to honor the terms of the guaranteed contract. There were two extensions of the CBA until the beginning of 2003. Only until negotiations went to impasse in October 2004, and defendants faced litigation and possibly magnificent damages in the hundreds of thousands of dollars, did the management change terms of the guaranteed contract.

In conclusion, since defendants have paid the regular full time drivers pursuant to a guaranteed contract under 29 U.S.C. § 207(f), defendants submit that they are exempt from the overtime regulations of the FLSA under this section of the statute.

## CONCLUSION

For the reasons set forth above, the defendants respectfully submit that this action should not be certified to proceed as a class action. The plaintiffs have failed to define a proper class. The nature of the claims asserted, plus proof of injury and damages, presents predominately individual questions of law and fact, and a class action is not a superior method for adjudicating this controversy. The plaintiffs and their counsel cannot adequately represent any class in this action, especially where unique claims and defenses will determine the merits of each plaintiff's own cause of action. There is still also no evidence that all of the named plaintiffs have expressly agreed to waive liquidated damages, which is a sina qua non to certifying the class on the New York Labor Law overtime claim.

The plaintiffs' exhibit, The Ennis Report, which purports to calculate overtime arrearages is grossly inaccurate. Since the defendants are exempt from the FLSA overtime provisions as taxi companies and because the drivers had guaranteed contracts, there is no independent basis for federal jurisdiction and the Court should dismiss the action.

Defendants respectfully request that the Court deny the plaintiffs' motion for partial summary judgment and certification of the class and grant the defendants' motion to dismiss the complaint, together with awarding the defendants costs and attorneys' fees and such other and further relief as the Court may deem just and proper.

Dated:    White Plains, New York
           January 7, 2005

                       TRIVELLA, FORTE & SMITH, LLP.

                       By: _____
                       Edward R. Hopkins, Esq. (EH-0590)
                       Attorneys for the Defendants
                       1311 Mamaroneck Avenue, Suite 170
                       White Plains, New York 10605
                       Tel.: (914) 949-9075
                       Fax: (914) 949-4752

To:    Shapiro, Beilly, Rosenberg,
        Aronowitz, Levy & Fox, LLP
        Barry I. Levy, Esq.
        Elan R. Kandel, Esq.
        Attorneys for the Plaintiffs
        225 Broadway, 13th Floor
        New York, New York 10007
        Tel.: (212) 267-9020