UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Franklin Mascol, et al.,

       Plaintiffs,              CV-03-3343 (CPS)

          - against -       MEMORANDUM OPINION
                                AND ORDER

E&L Transportation, Inc., et al.,

       Defendants.

----------------------------------------X

SIFTON, Senior Judge.

      This is a civil action brought by six named plaintiffs
in their individual capacities and on behalf of others similarly
situated for claims under sections 7(a), 11(c), 15(a)(2)(5), 16
and 17 of the Fair Labor Standards Act, as amended (29 U.S.C.
§§ 207(a), 211(c), 215(a)(2)(5), 216 and 217 (2004)) ("FLSA") and
claims under Article 19 of the New York State Labor Law ("NYS
Labor Law") and its implementing regulations, N.Y. Comp. Codes R.
& Regs. tit. 12, § 142-2.2 (2004).  The complaint, as amended,
alleges that defendants failed to pay plaintiffs – current and
former ambulette drivers – overtime pay at a rate of time and one
half for hours worked over 40 hours per week in violation of FLSA
and NYS Labor Law.  Plaintiffs seek unpaid overtime wages from
July 9, 2000 through the date of judgment, as well as liquidated
damages, pursuant to the FLSA and unpaid overtime from July 9,
1997 through the date of judgment and liquidated damages equal to

25% of the unpaid wages pursuant to state law.  In addition,
plaintiffs seek an injunction and declaratory relief and
attorneys' fees.

On January 27, 2004, the Court dismissed plaintiffs'
claims for declaratory and injunctive relief under the FLSA and
granted plaintiffs' motion to permit the action to proceed as a
representative action under 29 U.S.C. § 216(b) with respect to
the FLSA claims.  The court ordered (1) defendants to turn over
the names and addresses of potential plaintiffs by March 2, 2004,
(2) plaintiffs to send notice to potential class members by April
2,  2004, and (3) potential plaintiffs to return notices by May
28, 2004.

Plaintiffs, on consent, amended the complaint on March
17, 2004 to add Elbrus Transportation, Inc. ("Elbrus"),[1] Boris
Shamiloff, Arkadi Ashurov, and Eduard Pardilov, as successors in
interest to the original named defendants E&L Transportation,
Inc., E&L Transportation, Inc. d/b/a Community Transport,
Community Transportation, Inc., LCH Transportation Corp., Ely
Matalon, and Leon Krisinovsky.[2]  On March 29, 2004, the Court
(1) extended its January 27, 2004 order to apply to the new
defendants, (2) gave the new defendants until April 1, 2004 to

---

[1]Elbrus purchased the assets of the original defendants in
March of 2004.

[2]The complaint names Leon Krisinovsky.  The correct spelling
would appear to be Kryzhanovsky.

turn over the names and addresses of potential plaintiffs; (3) gave the plaintiffs until April 15, 2004 to send out notices; and (4) required the notices be received by June 15, 2004. On April 13, 2004, the March 29, 2004 order was again modified to (1) give defendants until April 30, 2004 to turn over the names and addresses, (2) give the plaintiffs until May 15, 2004 to send out notices; and (3) require that return notices be received by July 15, 2004.

Plaintiffs now move for partial summary judgment on the liability portion of the action. Defendants cross-move pursuant to Federal Rule of Civil Procedure 12(b) to dismiss the complaint on the grounds that defendants are exempt from the FLSA and that the Court should decline to exercise pendent jurisdiction over the state claims. Defendants' motion will also be treated as a motion for summary judgment since both defendants and plaintiffs ask the Court to consider material outside of the pleadings and have submitted Rule 56 statements. *Morelli v. Cedel*, 141 F.3d 39 (2d Cir. 1998); *see* Fed. R. Civ. P. 12(b); James Wm. Moore et al., *Moore's Federal Practice* § 56.30[4] (3d ed. 1997).

For the reasons set forth below, plaintiffs' motion for partial summary judgment is granted and defendants' motion is denied.

## BACKGROUND

The following facts are drawn from the parties'
pleadings, affirmations, affidavits, declarations, together with
the submissions in connection with the present motion and, except
as otherwise noted, are undisputed.

Plaintiffs and the class they seek to represent are
former and present ambulette drivers[3] that have been employed by
the defendants in the six years preceding the filing of the
complaint.  Defendants are for-profit domestic corporations and
individuals doing business in New York who employed plaintiffs in
an industry affecting commerce within the meaning of the FLSA, 29
U.S.C. §203.

Defendants provide passenger transportation services
for mobility-limited passengers in the city of New York, and
during the relevant period operated between 20 and 25 vans
capable of transporting disabled individuals and their durable
medical equipment.   Typically more than one passenger is

---

[3]In their papers, plaintiffs include helpers, referring to
employees who do not drive the ambulettes but who assist in loading
and unloading the passengers, in the plaintiff class.  However, in
their motion for class certification, plaintiffs describe the class as
follows:  "during the relevant six-year period, each potential class
member was employed by the Defendants as an ambulette driver,
generally worked in excess of forty hours each week, and was not
properly compensated for his/her additional labor."  (Pls.' Mem. at 2,
10.)  Since helpers were apparently compensated differently than were
full time drivers (60 hour drivers) and differently than regular
drivers (who worked less than 60 hours), the following analysis
pertains solely to former and present ambulette drivers.

transported in the vehicles at a given time.[4]  The vehicles do not have meters and defendants are compensated on the basis of a flat rate per trip.  The majority of the passengers transported on an annual basis do not pay defendants directly.  Rather, a third-party, such as Medicaid or the New York State Department of Health, reimburses defendants for the cost of the trip.

Defendants' vans display licenses indicating that they are licensed by the Taxi and Limousine Commission.  The Taxi and Limousine Commission has also issued paratransit base licenses to defendants' business.

In 1996, before the time period covered by this litigation, the Department of Labor ("DOL") investigated Community Transportation, Inc. for violations of the FLSA.  In 1996, a letter (the "Sinclair Letter") was issued to Ely Matalon, stating that Community Transportation, Inc., was not in violation of the FLSA and stated "We believe your firm to be exempt from OT [overtime] under FLSA Reg Section 13(b)17 . . . taxicab."  The letter was issued from the Employment Standards Administration, Wage and Hour Division, DOL, and signed by Doreen L. Sinclair, an investigator.

---

[4]Although defendants say that they dispute this fact, their response is that "they often transport only one passenger or one passenger with his/her personal escort" and the Kryzhanovsky Affidavit cited in support of the disputed fact states that "Typically one or more passengers are transported in the defendants' vehicles."  (*See* Defs.'s Resp. To Pls.' Rule 56.1 Statement; Defs.' Aff. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Defs.' Cross-Mot. for Dismissal ("Kryzhanovsky Aff.") ¶ 55.)

Effective January 1, 1999, plaintiffs' terms of compensation were the subject of a collective bargaining agreement between Local 531, International Brotherhood of Teamsters, A.F.L.-C.I.O. and Community Medical Transport, Inc. And E&L Transport, Inc. ("CBA"). The parties do not dispute that the terms and conditions of plaintiffs' employment in the period from July 9, 1997 through January 1, 1999 were similar to those contained in the collective bargaining agreement.

The CBA, in effect from January 1, 1999 to December 31, 2001 provides as follows:

Article 5 Overtime

5.1

Overtime shall be paid in accordance with past practice. Such practice must conform to State and Federal Law. It is expressly understood that overtime pay at the appropriate rate has been calculated into the weekly salary paid to regular full-time employees.

Article 24 Wages

24.1
Regular full-time employees shall be paid a weekly salary according to the following progression. The date of any increases described in the progression shall be determined by the Employer on an individual basis within the range of dates set forth herein:
Starting rate: $450.00 per week
Increase:
$25.00 per week Six (6) to Nine (9) months after the date of hire
$25.00 per week Six (6) to Nine (9) months later

$25.00 per week Nine (9) to Twelve (12)
months later
$25.00 per week Nine (9) to Twelve (12)
months later

24.2
Regular drivers who are scheduled to work
less than sixty (60) hours per week shall be
paid accordingly to the following
progression.  The date of any increases
described in the progression shall be
determined by the Employer on an individual
basis within the range of dates set forth
herein:
Starting rate: $7.50 per hour
Increase:
$.25 per hour Six (6) to Nine (9) months
after the date of hire
$.25 per hour Six (6) to Nine (9) months
later
$.25 per hour Nine (9) to Twelve (12) months
later
$.25 per hour Nine (9) to Twelve (12) months
later

Plaintiffs claim based on pay stubs for five of the
named plaintiffs and quarterly payroll records that plaintiffs
were paid straight time for the first sixty hours worked.
Defendants contend (1) that plaintiffs were paid straight time
for only forty hours, time and a half for the next twenty hours,
and a rate defendants refer to as "overtime plus" rate for work
above the 60th hour; (2) that defendants' business is exempt from
the FLSA or, alternatively, (3) that they believed in good faith
they were exempt from the FLSA because of the Sinclair Letter.

**DISCUSSION**

<u>Jurisdiction</u>

The Court has jurisdiction over the federal claims under 29 U.S.C. §216(b) and 28 U.S.C. § 1331 and over the state claims under 28 U.S.C. § 1367. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81 (S.D.N.Y. 2001)(asserting claims under New York's Minimum Wage Act).

<u>Summary Judgment Standard</u>

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Electrical Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). If the moving party's initial burden is met, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210-11 (2d Cir.1988). Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a metaphysical doubt as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc., v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and

drawing all inferences in favor of the non-moving party, there is a genuine issue for trial. *Anderson*, 477 U.S. at 249 (1986); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). A genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

*I.  Rates Paid to Plaintiffs*

*FLSA*

Under the Fair Labor Standards Act, employers must pay employees time-and-a-half for all hours worked over 40 hours per week. See 29 U.S.C. § 207(a)(1) prohibiting an employer from employing an employee "for a workweek longer than forty hours unless such employee receives compensation for his employment ... at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1); *Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 31 (2d Cir. 2002). New York State Labor Law requires employers to pay their employees "for overtime at wage rate of one and a half times the employee's regular rate for hours worked in excess of 40 hours" per week. N.Y. Comp. Codes R. & Regs. tit. 12, §138.2.2 (2004); *see Moon v. Kwon*, 248 F. Supp.2d 201, 227 (S.D.N.Y. 2002); *see also Manliguez v. Joseph*, 226 F. Supp.2d 377, 389 (E.D.N.Y. 2002).

An employee who sues for unpaid overtime must prove that the employer has not compensated the employee for work

performed. *Grochowski v. Phoenix*, 318 F.3d 80, 87-88 (2d Cir. 2003)(citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).  The Court of Appeals has also held that under the FLSA, even "[w]hen accurate records or precise evidence of the hours worked do not exist, an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Grochowski,* 318 F.3d at 87-88 (*citing Tran*, 281 F.3d at 31); *see also Moon v. Kwon*, 248 F. Supp. 2d 201 (S.D.N.Y. 2002)("when employer fails to maintain records concerning employee's wages, hours . . . as required by the FLSA, plaintiff may carry out this burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence in the damages phase to show amount and extent of that work as a matter of just and reasonable inference").[5]

---

[5]29 C.F.R. §516.2(a) requires employers to maintain and preserve payroll records for non-exempt employees that specify:

> [the] regular hourly rate of pay for any workweek in which overtime compensation is due . . . , [the] hours worked each workday and total hours worked each workweek . . . , [the] total daily or weekly straight time-earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation . . . [and] the total premium pay for overtime hours.

29 C.F.R. § 516.2 (2005).  *See Jacobson v. Stop & Shop Supermarket Co.*, 2003 WL 21136308, at *2 (S.D.N.Y. May 15, 2003)("[D]efendant's
(continued...)

Once plaintiffs have met their initial burden, the burden shifts to the employer to present the court with evidence to negative the reasonableness of the inference to be drawn from the employees' evidence. *See, e.g., Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 31 (2d Cir. 2002); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 87-88 (2d Cir. 2003); *Liu v. Jen Chu Fashion Corp.*, 2004 WL 33412, at *2 (S.D.N.Y. January 7, 2004)("in the absence of rebuttal by defendants, plaintiffs' recollection and estimates of hours worked are presumed to be correct").

<u>Plaintiffs' Evidence</u>

Plaintiffs' evidence consists of numerous weekly pay stubs explicitly setting forth the hourly rates at which they were paid and in many cases the hours worked at these hourly rates.

---

[5](...continued)
own payroll records can be read as evidence that there was no overtime payment for any of the hours worked beyond forty hours a week. They contain no break down as required by 29 C.F.R. § 516.2, and make no other mention of an hourly rate or overtime. The written materials it presented to such employees would have led them to believe that the company considered them to be exempt employees who were not entitled to overtime.") Defendants here have submitted a limited number of payroll records that do not spell out either the regular hourly rate of pay or overtime rate of pay for workweeks in which overtime compensation would be due. Defendants have also submitted a few time sheets for drivers and helpers which list the times when certain workers checked in and out. (The names of the workers are not clear from the copies.) The time sheets as well do not have any information regarding either straight time or overtime rates of pay or hours.

The pay stubs show that plaintiffs were paid a straight hourly rate for hours worked between 40 to 60 and time and a half only for hours in excess of 60.  For example, Franklin Mascol was paid $10.00 per hour for 40 hours worked (11/09/02-11/15/02), for 48 hours worked (1/04/03-1/10/03), for 49.5 hours worked (12/28/02-01/03/03), and for 50 hours worked (11/16/02-11/22/02).[6]  Angel Torres' pay stubs show a rate of $9.50 per hour for 51.5 hours worked (12/07/02-12/13/02) and for 56.25 hours (12/14/02-12/20/02) worked.[7]  Darryl Stevens' pay stubs show he was paid $9.58 per hour for 40 hours worked (5/31/03-6/06/03), for 45 hours worked (6/7/03-6/13/03), for 49.75 hours worked (5/24/03-5/30/03), and for 50 hours worked (4/26/03-5/02/03, 5/10/03-5/16/03, 5/17/03-5/23/03).  Kurt Washington was paid $9.50 per hour for 49.25 hours worked (5/1/04-5/7/04), the same hourly rate for 51 hours worked (6/5/04-6/11/04), for 53.25 hours worked (4/3/04-4/9/04), and for 54.75 hours worked

---

[6]The Mascol pay stub evidence includes at least fourteen more pay stubs with the $10.00 hourly rate explicitly set forth when hours worked are less than 60.  Thirteen pay stubs set forth a weekly rate of $600, and in some cases overtime paid at a rate of $15.00 per hour for hours in excess of 60(for example, for the week of 12/21/02-12/27/02, $15.00 is 150% of $10.00).  (*See* Pls.' Mot. Mascol Decl. Exs. A, B, C.)

[7]Other pay stubs show a weekly rate of $575 and then $14.37 per hour for overtime (for example, for the week of 2/1/03-2/7/03, Torres received $575 and then 14.37 for 7 hours).  Since $575 divided by 60 equals an hourly rate of $9.50 and 14.37 is 150% of 9.50, the stubs suggest that Torres was only paid time and a half for hours worked in excess of 60. *(See* Pls.' Mot. Torres Decl. Exs. A, B, C.)

(3/20/04-3/26/04).[8]  Straker's pay stubs show that he was paid

$7.91 per hour for 40.5 hours worked (2/8/03-2/14/03), for 44.25

hours worked (5/31/03-6/6/03), for 50 hours worked (4/19/03-

4/25/03), and for 55 hours worked (1/25/03-1/31/03).[9]

        Other pay related evidence includes payroll check

registers which also support plaintiffs' contention that straight

rates were paid for overtime work.  For example, the payroll

check register for week #39 (date 9/25/98) shows that Franklin

Mascol was paid $500.00 for 60 hours of work and no overtime,

that Angel Torres was paid $450.00 for 60 hours of work and

$11.25 per hour for 8.5 hours of overtime, that Jason Lopez (not

a named plaintiff) was paid $525.00 for 60 hours at a $8.75

hourly rate and $13.00 per hour for three hours in excess of 60

hours. (Reply Affirmation in Supp. of Defs.' Cross-Mot. to Dismiss the

Compl. ("Defs.' Reply Affirmation") Ex. I.)

        In an effort to rebut plaintiffs' evidence, defendants point

initially to the collective bargaining agreement which states:

"[o]vertime shall be paid in accordance with past practice.  Such

practice must conform to State and Federal Law.  It is expressly

understood that overtime pay at the appropriate rate has been

---

[8]Other pay stubs for Washington show $9.50 per hour as the
rate paid for hours worked from 40 to 60 hours.  (*See* Pls.' Mot.
Washington Decl. Exs. A, B, C.)

[9]Other Straker pay stubs show the $7.91 rate explicitly.
Still other pay stubs show a weekly rate of $475 ($7.91 times 60)
(1/11/03-1/17/03) with $11.875 noted as the overtime rate paid for
7.75 hours ($11.875 is 150% of $7.91).  (*See* Pls.' Mot. Straker Decl.
Exs. A, B.)

calculated into the weekly salary paid to regular full-time employees." As noted by the Supreme Court in *149 Madison Ave. V. Asselta*, 331 U.S. 199, 204 (1947): "[a] wage plan is not rendered invalid simply because, instead of stating directly an hourly rate of pay in an amount consistent with the statutory requirements, the parties have seen fit to stipulate to a weekly wage inclusive of regular and overtime compensation for a workweek in excess of 40 hours and have provided a formula whereby the appropriate rate may be derived therefrom." Here, however, the collective bargaining agreement provides no such formula. Moreover, as noted by the Supreme Court: "[t]he crucial questions . . . are whether the hourly rate derived from the formula . . . was, in fact, the regular rate of pay within the statutory meaning and whether the wage agreement under consideration, in fact, made adequate provision for overtime compensation." *Id.; and see U.S. v. Adams*, 143 F.3d 61 (2d Cir. 1998)(citing *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945)).

The only formula offered by defendants appears not in the collective bargaining agreement but rather in their papers on this motion. The formula does not establish the "regular rate of pay" for each plaintiff since it is simply an ex post facto division of particular weekly pay checks for a week in which a worker worked in excess of forty hours into 40 hour and in excess of 40 hour components with a different hourly rate for each week depending on the total number of hours worked. The formula

[weekly paycheck = 40 hours times y plus overtime hours times 1.5 y in which "y" equals the hourly wage] in fact (1) only works to defendants' advantage for weeks in which a worker is employed for an excess of 40 hours; and (2) only provides for compensation at a rate of time and a half for overtime by reducing the hourly compensation paid for the first 40 hours of work.  For example, plaintiff Mascol in the week of November 9, 2002 earns $400 for 40 hours of work.  Using defendants' formula (weekly wage of $400=40y + O(1.5y)) his hourly wage is $10.00.  However, for the week of January 4, 2003 in which he works 48 hours his weekly wage according to the formula can only be $9.23 an hour for the first forty hours because his hourly wage for the eight hours of overtime work must be $13.84 in order to satisfy the time and a half requirement.  The formula is, in short, a "sham," *cf. U.S. v. Adams,* 143 F.3d at 67 and does not at all reflect "the regular rate of pay" at which plaintiffs were compensated.

In a further attempt to negate the reasonableness of the inference to be drawn from plaintiffs' evidence that plaintiffs were not paid overtime for hours worked beyond 40 hours, defendants explain a few pay stubs presented for Winston Straker and Kurt Washington.  Winston Straker's pay stub for week ending 3/14/03 shows the hourly rate of $7.91 per hour times 63.25 hours for a total sum of $500.30.  Defendants seek to explain these figures by arguing that Straker was paid 40 hours

at $6.78 for total of $271.20 straight time pay and 23.25 hours
at $10.17 for total of 236.45 overtime adding up to a weekly
figure of $507.65.  To explain the difference between this figure
and the $500.30 he was actually paid, defendants state: "he was
underpaid by $7.35. . . The inconsistency is a result of
bookkeeping errors (use of pay rate $7.91)".  (*See* Kryzhanovsky
Reply Aff. ¶¶ 31-35.)

Regarding Straker's pay stub ending 2/14/03[10] which
shows 40.50 hours at the pay rate of $7.91 for total earnings of
$320.35, defendants urge that Straker was paid 40 hours at $6.78
for total of $271.20 and .5 hours at $10.17 for total of $5.09
and a weekly wage total of $276.29.  Thus, according to
defendants "he was overpaid by $44.06."  (Kryzhanovsky Reply Aff.
¶¶ 33.)  Defendants explain Kurt Washington's pay stub for the
week ending 6/18/04 as the result of a bookkeeping error
resulting in a $5.00 underpayment.  (Kryzhanovsky Reply Aff.
¶38).

Reliance by defendants on a series of "the dog ate my
homework" claims of "bookkeeping error" to explain only a few of
the many examples offered by the plaintiffs of weekly pay
calculated on the basis of an hourly wage plus time and a half
for hours worked in excess of sixty is insufficient as a matter
of law to "negative the reasonableness" of plaintiffs' inference

---

[10]Defendants mistakenly refer to 2/16/03.

that they were paid in violation of the FLSA. *See Anderson*, 328 U.S. at 687-88.

Since defendants have not come forward with "evidence to negative the reasonableness of the inference to be drawn from the employee[s'] evidence", the inference of straight rate payment for overtime is unavoidable. *Id., and see Grochowski*, 318 F.3d at 87-88. Thus, defendants have failed to raise a genuine issue of material fact that would prevent the granting of summary judgment for plaintiffs as a matter of law.

## II. *"Taxicab" Exemption*

The FLSA exempts from the overtime provisions "any driver employed by an employer engaged in the business of operating taxicabs." 29 U.S.C. § 213(b)(17). Defendants assert that their business falls within the taxicab exemption of the FLSA.

Exemptions from coverage under the FLSA are to be narrowly construed, *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S. Ct. 807, 89 L. Ed. 1095 (1945), *Coke v. Long Island Care At Home, Ltd.*, 376 F.3d 118,123 (2d Cir. 2004) and the employer bears the burden of proving the application of an exemption. *Coke*, 376 F.3d at 123.

No courts in this circuit have addressed the taxicab exemption with respect to ambulette type vehicles. However, a district court in Wisconsin has done so holding that the

taxicab exemption does not apply to an ambulette business such as defendants'. *See Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054 (E.D. Wis. 1998). This decision was subsequently relied on by the DOL in issuing a published opinion also determining that ambulette businesses are not exempt from overtime requirements of the FLSA. *See* Opinion Letter, Wage and Hour Division, United States Department of Labor, 1998 WL 852774, at *1 (April 17, 1998)("Opinion Letter"). The parties do not provide, and the Court has not found any authorities to the contrary.

In *Brewah*, the Secretary of Labor filed an action alleging that the transportation service did not comply with the overtime provisions because defendants only paid overtime for hours worked in excess of 80. The business in *Brewah* transported mobility impaired customers on a round trip or one-way basis in Milwaukee County, Wisconsin. *Brewah*, 992 F. Supp. at 1055. The court, noting that it could find no controlling case law from the Supreme Court or the Seventh Circuit interpreting the taxicab exemption, focused on two decisions from other circuits that had considered the exemption in the context of corporations which provided airline transportation services and concluded that the narrow exemption did not apply. *Id.* at 1058 (citing *Airlines Transp. v. Tobin*, 198 F.2d 249 (4th Cir. 1952) and *Wirtz v. Cincinnati, Newport & Covington*

*Transp. Co.*, 375 F.2d 513 (6th Cir. 1967)). The district court

placed significant weight on the following factors:

> . . . the defendants' business is different
> from the operation of a taxicab company in
> many critical respects. The drivers of
> defendants' vehicles are required to adhere
> to a daily work schedule which is
> prearranged by the defendants and/or
> dispatcher, not the individual drivers. . .
> . Typically, more than one passenger is
> transported at a time. The defendants'
> vehicles are unmetered, do not have vacancy
> signs and are not advertised as taxicabs.
> Unlike the defendants' transportation
> service, taxicab companies do allow their
> drivers to pick up passengers at their
> discretion, usually transport one fare at a
> given time, and do not operate on
> prearranged schedules.
> The defendants' involvement in various
> subsidy programs also distinguishes it from
> a taxicab company. In general, taxicab
> operations receive 100% of the fare from
> the passenger himself or herself and do not
> participate in any program which provides a
> co-payment of the cost of transportation or
> limits the area in which the passenger may
> be transported . . .
> Another factor which weighs against a
> finding that the defendants' business
> qualifies for the taxicab exemption is the
> fact that Brewah Cab is not licensed by the
> City of Milwaukee as a taxicab company.
> Instead, the defendants' vehicles are
> licensed as "handicapped elderly vehicles."
> As such, the defendants' vehicles are
> equipped to accommodate wheelchairs. . . .

*Id.* at 1060. The court concluded that the characteristics of

the Brewah Cab company's operation did not make it the type of

operation "contemplated by Congress when it created the narrow

exemption for taxicab companies under §213(b)(17)."

On April 17, 1998, the Wage and Hour Division
published an Opinion Letter interpreting the taxicab exemption
and citing to *Brewah* with approval.  The Opinion Letter
provides, in pertinent part:

> Your client provides passenger
> transportation services for mobility-
> limited passengers... utilizing vehicles
> capable of transporting disabled
> individuals and their equipment.  Your
> client's service is initiated through phone
> requests for transportation of such
> individuals, either prescheduled or by
> immediate dispatch of a vehicle.  The
> vehicles are radio dispatched to provide
> door-to-door service and take passengers to
> the same places that a person would take a
> taxicab, such as to visit friends and
> relatives, to go shopping, to go to the
> doctor, to go out to eat, or to any other
> such destination the passenger requests.
> The passengers pay all of the cost of the
> trip or a part of the cost, with the
> remainder paid by a third-party agency.
> The vehicles do not have meters, so the
> passengers pay a flat rate per trip.

The Opinion Letter notes that the term "taxicab" was not
expressly defined in the FLSA but that Congress must have
intended the words in the statute to carry their ordinary
meaning:

> While your client's vehicles might be
> involved in a number of activities
> associated with taxicab operations . . .
> overall, your clients vehicles do not
> service the same transportation needs as
> taxicabs.  The ordinary meaning of that
> term contemplates vehicles that are offered
> for hire to the general public on the city
> streets.

*Id.* (citing *Pioneer Inv. Servs. v. Brunswick Assocs.*, 113 S.
Ct. 1489 (1993)). The Opinion Letter reasons that given the
general principle that exemptions under the FLSA must be
narrowly construed, the drivers of this business would not be
exempt from overtime unless it was clearly the intent of
Congress. *Id.* (*citing* to *Arnold v. Ben Kanowsky, Inc.*, 361
U.S. 388,. 392 (1960)). The agency concluded that "it is the
opinion of the Division that the drivers of the vehicles used
to transport mobility-limited passengers would not qualify for
the 13(b)(7) exemption." *Id.*

For the reasons articulated in *Brewah* and the DOL
opinion, I conclude that the taxicab exemption does not apply
here. A DOL opinion letter is "entitled to respect" to the
extent it is persuasive. *See Christensen v. Harris County*, 529
U.S. 576, 120 S. Ct. 1655, 1657 (2000)(citing *Skidmore v. Swift
& Co.*, 323 U.S. 134, 140 (1944)); *see also Coke v. Long Island
Care At Home, Ltd.*, 376 F.3d 118, 133 (2d Cir. 2004)(*Skidmore*
deference appropriate based upon regulation's "power to
persuade" when agency has special expertise in issuing
interpretive regulation). Defendants' vehicles are ambulettes
used to transport mobility limited passengers, the vehicles are
not licensed as taxicabs, 95% of the business is paid for by
the New York State Department of Health through its Medicaid

program, the vehicles are not metered, and the rates are predetermined.

Defendants urge that there are differences between their business and the business in *Brewah* cab.   In *Brewah*, drivers did not accept tips and did not wait for passengers at homes or destinations whereas defendants' drivers can accept tips and can wait between 30 and 45 minutes.   Defendants' business is licensed by New York City Taxi and Limousine Commission ("TLC").   However, the license issued is a "Paratransit Base License" and not a "taxicab" license.[11]   The facts that drivers accept tips and operate under paratransit licenses do not convert defendants' van service into a taxicab

---

[11]On its website, the TLC describes itself and the types of licenses it issues as follows: "[the TLC,] created in 1971, is the agency responsible for licensing and regulating New York City's medallion (yellow) taxicabs, for-hire vehicles (community-based liveries and black cars), commuter vans, paratransit vehicles (ambulettes) and certain luxury limousines."   The TLC distinguishes between taxicab licenses and paratransit licenses for both base (approved and licensed place of business) owners and drivers.   It defines "paratransit service" as "a transportation service for persons with disabilities, including all ambulette services" and a "paratransit vehicle" as "a wheelchair accessible van...[including] all ambulettes (whether wheelchair accessible or not)" and states that "Transportation service for people with disabilities" are also known as "paratransit service or ambulette service".
*See* http://www.nyc.gov/html/tlc/html/about/about.shtml; http://www.nyc.gov/html/tlc/downloads/pdf/pararules.pdf.

Although five of defendants' twenty-two vans have been issued "for-hire" licenses, the balance have not, and the fact that these "for-hire" licenses exist does not change the fact that all of defendants' vans are engaged in the business of providing transportation services for mobility impaired customers.

company of the sort contemplated by Congress in creating the
exemption.

*III.  Portal Act*

Defendants assert that even if the exemption does not
apply, defendants' compensation scheme was administered in good
faith reliance on "a determination of the Wage and Hour
Division of the Employment Standards Administration of the U.S.
Department of Labor" - the Sinclair Letter referred to above.
Defendants contend that their actions are immunized by Section
10 of the Portal-to-Portal Act, 29 U.S.C. § 259 (1976)(the
"Portal Act").[12]

---

[12]The Portal-to-Portal Act, 29 U.S.C. § 259 provides:

(a) [i]n any action or proceeding based on any
act or omission on or after May 14, 1947, no
employer shall be subject to any liability or
punishment for or on account of the failure of
the employer to pay minimum wages or overtime
compensation under the Fair Labor Standards Act
of 1938, as amended . . . if he pleads and proves
that the act or omission complained of was in
good faith in conformity with and in reliance on
any written administrative regulation, order,
ruling, approval, or interpretation, of the
agency of the United States specified in
subsection (b) of this section, or any
administrative practice or enforcement policy of
such agency with respect to the class of
employers to which he belonged.  Such a defense,
if established, shall be a bar to the action or
proceeding, notwithstanding that after such act
or omission, such administrative regulation,
order, ruling, approval, interpretation,
practice, or enforcement policy is modified or
rescinded or is determined by judicial authority
to be invalid or of no legal effect.
(b) The agency referred to in subsection (a) of

(continued...)

The Portal Act defense was established to protect employers from liability if they took certain actions in reliance on an interpretation of the law by a government agency, even if that interpretation later turned out to be wrong. *Equal Employment Opportunity Comm'n v. The Home Insurance Co.*, 672 F.2d 252, 263 (2d Cir. 1982).

In *Home Insurance*, the Court of Appeals reviewed a district court's granting of summary judgment in favor of an employer on the grounds of a Portal Act defense in reliance on *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88 (2d Cir. 1950), *cert. denied*, 346 U.S. 877 (1953) and clarified the elements necessary to establish such a defense. An employer must establish three elements to successfully invoke the defense: (1) that it acted in reliance on a ruling of the Administrator, (2) that its action was in conformity with that ruling, and (3) that it acted in good faith. *Home Insurance*, 672 F.2d at 263.

*First element - Ruling*

Different types of agency actions have been considered by courts in determining what constitutes "any

---

[12](...continued)
this section shall be --
(1) in the case of the Fair Labor Standards Act of 1938, as amended – the Administrator of the Wages and Hour Division of the Department of Labor.
29 U.S.C. § 259 (2005).

administrative regulation, order, ruling, approval, or interpretation." Published opinion letters and published regulations of the Wage-Hour Administrator may establish the defense, but only if they give the employer guidance with respect to the employer's specific proposed action. *See, e.g.*, *Martinez v. Phillips Petroleum Co.*, 283 F. Supp. 514, 526 (D. Idaho 1968)(letter written by Administrator of Wage and Hour Division of DOL as consequence of individual request for ruling upon particular questions, particular facts having been presented to the agency, and when letter stated in plain language that under these facts bus drivers were exempt from FLSA and cited exemption provision, letter constituted a "ruling" for the good faith defense). The Court of Appeals has held that when a published ruling effectively leaves an employer to his own devices with respect to interpreting the Act, the employer cannot satisfy the "ruling" prong of the Portal defense. *Home Insurance*, 672 F.2d at 264-65. Thus, referring to the Portal Act's legislative history, the Court of Appeals noted that the Portal Act defense does not apply "where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him." *Id.*

Although the Sinclair Letter is not a published letter or opinion of the sort expressly contemplated by the Portal Act, the letter issued to defendants was specific in

addressing defendant's particular business, as it was in
response to an investigation of defendant's pay practices, and
the letter cited legal authority. *See id; Martinez v. Phillips
Petroleum Co.*, 283 F. Supp. 514. *See, e.g.*, district court
opinion in *Addison*, 96 F. Supp. 142, 159 (S.D.N.Y. 1950)(agency
advice was specific and left no room for interpretation where
advice was given by the Regional Attorney in response to an
inquiry to the Wage Administrator about overtime pay practices
under the collective bargaining agreement at issue).[13] Since
the letter was issued by the Wage and Hour Division as a result
of a specific official investigation, even though it was not a
published formal statement, it qualifies as an official letter
representing the position of the Wage and Hour Division and so

---

[13]In *Martinez*, defendant corporation Phillips took over a
contract to operate buses for the United States Atomic Energy
Commission from the Lost Rivers Transportation Company.  The ruling
regarding the exemption was issued to Lost Rivers.  The court found
that since it was undisputed that Phillips took over from Lost Rivers
the operation of the transportation system without any substantial
changes in the method of operation and also that substantially all the
employees including the drivers became employees of Phillips and that
it was undisputed that Phillips was aware of all the rulings and
interpretations previously secured by the predecessor company.
Similarly, here, although the Sinclair Letter was issued to Community
Transportation, Inc., it is undisputed that E&L Transportation, Inc.
took over the business without any material changes to the operations
or employees or wage practices.  Accordingly, E&L stands squarely in
the place of Community Transportation for purposes of the analysis of
the good faith defense.

it must be a "ruling" of an "Agency" as contemplated by the
Portal Act.[14]

### Third Element - Good Faith

Assuming that defendants relied on the Sinclair
Letter and assuming that their pay practices conformed to the
letter thus satisfying the second element of the Portal
defense,[15] the availability of the defense rests on the third
element articulated in *Home Insurance*, good faith reliance.  I
find that defendants' continued reliance on the Sinclair Letter
in light of subsequent developments, namely, the federal
district court decision issued on February 3, 1998 in *Brewah*
deciding that the taxicab exemption did not apply to a business
virtually identical to defendants' and the published DOL
opinion letter on April 17, 1998 citing *Brewah* and arriving at
the same conclusion - was not in good faith according to the
guidelines established in this circuit.

---

[14]Plaintiffs do not contend that any material facts about
the investigation are in the dispute - that the documents examined by
the inspector, for example, were inadequate or false and so did not
represent the actual pay practices.  Plaintiffs' argument is a legal
argument - that the letter does not constitute a "ruling" under the
Portal Act and that in any case due to a subsequent published opinion
letter issued by the Administrator of the Wage and Hour Division and a
published judicial opinion both of which consider businesses such as
defendants' (passenger transportation services for mobility-limited
passengers) and determine that these businesses do not fall into the
taxicab exemption of the FLSA render defendants' subsequent
continuation of their pay practices in reliance on the Sinclair Letter
not in good faith.

[15]The conformance prong of the Portal defense is not in
dispute.

*Good Faith - Objective Standard*

The good faith test in this circuit requires a defendant to show more than subjective good faith, but rather "reasonable grounds for belief" that the ruling relied on remains good law. *Home Insurance*, 672 F.2d 267.[16] Thus, the Court of Appeals found that even when an employer makes an honest but unsuccessful attempt to obtain information about an exemption, it is not relieved of liability. *Id.* ("We believe the Portal Act requires more [than an honest intention to ascertain what the ... Act requires]" in the context of a statute giving generalized guidance and employer making an "improvident interpretation" of the statute). *Id.* at 266.

The regulations interpreting the effect of the Portal Act on the FLSA, Section 790.17, "Administrative regulation, order, ruling, approval, or interpretation" counsel the same conclusion. *See* 29 C.F.R. § 790.17.[17]

---

[16]In *Home Insurance*, the Court of Appeals distinguished the facts of *Addison* in connection with deciding that objective good faith was required and was persuaded that the *Addison* court's dicta stating that only subjective good faith was required had some validity when the guidance relied on by the employer was specific to the employer's business. However, after reviewing the *Addison* decision, the Court of Appeals ultimately found that the employer did not exhibit objective good faith because it interpreted a general guideline incorrectly and unreasonably. The crux of the objective test is a determination that given all the circumstances, the employer's action in relying on a ruling, whether specific or general with respect to the business, is reasonable.

[17]The Regulation provides as follows:

(continued...)

The Letter Opinion of April 17, 1998 is the first instance of the division's public ruling regarding the application of the taxicab exemption to ambulette type vehicles. Accordingly, there is not an earlier formal ruling to be explicitly rescinded because the division had not

---

[17](...continued)
(I) To illustrate these principles, assume that the Administrator of the Wage and Hour Division, in reply to an inquiry received from a particular employer, sends him a letter, in which the opinion is expressed that employees performing a particular type of work are not covered by the Fair Labor Standards Act. The employer relied upon the Administrator's letter and did not pay his employees who were engaged in such work, in accordance with the provisions of the Fair Labor Standards Act. Several months later the Administrator issues a general statement published in the Federal Register and given general distribution, that recent court decisions have persuaded him that the class of employees referred to above are within the coverage of the FLSA. Accordingly, the statement continues, the Administrator hereby rescinds all his previous interpretations and rulings to the contrary. The employer who had received the Administrator's letter, not learning of the Administrator's subsequent published statement rescinding his contrary interpretations, continued to rely upon the Administrator's letter after the effective date of the published statement. Under these circumstances, the employer would, from the date he received the Administrator's letter to the effective date of the published statement rescinding the position expressed in the letter, have a defense under section 9 or 10, assuming he relied upon and conformed with that letter in good faith. However, in spite of the fact that this employer did not receive actual notice of the subsequent published statement, he has no defense for his reliance upon the letter during the period after the effective date of the public statement.
29 C.F.R. § 790.17 (2005).

previously ruled to the contrary.  Presumably, because the
Sinclair Letter was not a published opinion, the division would
not refer to it in its Letter Opinion.

The policy of protecting employees from violations of
the FLSA overtime requirements is served by the law and
regulations which create an affirmative duty on an employer to
ascertain that exemptions apply and that the employer is in
compliance with the most current policies of the DOL.  The
regulation dovetails with the objective Portal Act test
articulated by the Court of Appeals:  given that exemptions
must be narrowly construed, the employer has a duty to comply
with the FLSA and to pay overtime to employees that are covered
by the FLSA.

Accordingly, defendants have not shown good faith
for purposes of the Portal Act by disregarding *Brewah* and the
Opinion Letter of 1998.  Thus, the Portal Act defense is not
available to defendants for unpaid overtime wages from February
3, 1998, the date of the decision in *Brewah*, through the date
of judgment.

*IV.  Guaranteed Contract/"Belo" Plan*

In their reply papers, defendants advance for the first
time an argument not raised previously in either their
opposition to plaintiffs' motion or in their own motion for
summary judgment.  Defendants assert that wages paid to

plaintiffs' were not in violation of the FLSA because they met

the requirements for exemption from overtime of Section 7(f) of

the FLSA, a compensation plan that is known as a "Guaranteed

Contract" or "Belo" contract.  *See* 29 U.S.C. §207(f)(2004).

FLSA §7(f) provides as follows:

> Employment necessitating irregular hours of work
>
> No employer shall be deemed to have violated
> subsection (a) of this section by employing any
> employee for a workweek in excess of the maximum
> workweek applicable to such employee under subsection
> (a) of this section if such employee is employed
> pursuant to a bona fide individual contract, or
> pursuant to an agreement made as a result of
> collective bargaining by representatives of
> employees, if the duties of such employee necessitate
> irregular hours of work, and the contract or
> agreement (1) specifies a regular rate of pay of not
> less than the minimum hourly rate provided in
> subsection (a) or (b) of section 206 of this title
> (whichever may be applicable) and compensation at not
> less than one and one-half times such rate for all
> hours worked in excess of such maximum workweek, and
> (2) provides a weekly guarantee of pay for not more
> than sixty hours based on the rates so specified.

29 U.S.C. § 207(f)(2005).

### *Procedural Bar/Affirmative Defense first raised now*

A court may choose to not consider arguments first raised

in reply papers in support of a motion.  *See e.g.*, *Playboy*

*Enters, Inc., v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y.

1997), *aff'd*, 159 F.3d (2d Cir. 1998), *Domino Media, Inc. v.*

*Kranis*, 9 F. Supp.2d 374 (S.D.N.Y. 1998), *Pyramyd Stone*

*International v. Crosman Corp.*, 1997 WL 66778 *17-18 n. 2

(S.D.N.Y. 1997), *Cumis Insurance Society v. Citibank*, 921 F.

Supp. 1100, 1110 n. 7 (S.D.N.Y. 1996). However, because plaintiffs have had an opportunity to respond and did respond to the "guaranteed contract" argument, I have considered this argument.

Defendants have the burden of coming forward with evidence to support this affirmative defense. *See Federal Deposit Insurance Corp. V. Giammettei*, 34 F.3d 51, 54-55 (2d Cir. 1994); *Dollar Dry Dock Savings Bank v. Hudson Street Development Associates*, 1995 WL 412572, at *5 (S.D.N.Y. July 12, 1995). This they have not done.

The method of compensation approved by Section 7(f) of the FLSA "may be implemented only for employees whose duties require irregular hours of work which the employer cannot reasonably control or anticipate." Opinion Letter, Wage and Hour Division, United States Dep't of Labor, 1997 WL 972397 (October 31, 1997). See 29 C.F.R. § 778.404. As stated in 29 C.F.R. §778.405:

> The subsection is not designed to apply in a situation where the hours of work vary from week to week at the discretion of the employer or the employee, nor to a situation where the employee works an irregular number of hours according to a predetermined schedule. The nature of the employee's duties must be such that neither he nor his employer can either control or anticipate with any degree of certainty the number of hours he must work from week to week. Furthermore, for the reasons set forth in § 778.406, his duties must necessitate significant variations in weekly hours of work both below and above the statutory weekly limit on nonovertime hours.

Because a weekly sum is guaranteed, whatever sum is
guaranteed must be paid in full in all workweeks in which the
employee performs any amount of work for the employer and is
not subject to any proration during short weeks.  Deductions
cannot be made for time lost from work because of sickness,
accidents, legal holidays and the like.  *See* Opinion Letter,
1999 WL 1002378.

Defendants' own papers defeat their argument that the
putative class members maintained irregular hours of work as
required to justify a Section 7(f) exemption.  First, in his
Reply Affidavit, Mr. Matalon states that "I initially required
the drivers to work six (6) days, which resulted in sixty (60)
hour workweek... As the business grew, there became a need for
more flexibility in the sixty (60 hour workweek schedule for
drivers.  I scheduled several drivers for twelve (12) hour work
days.  These drivers worked five (5) days a week for a total of
sixty (60) hours in the workweek".  (*See* Matalon Reply
Affidavit at ¶¶'s 12-13.)  Mr. Matalon also states that "most
employees worked sixty (60) hours."  *Id.* at ¶ 24.  This scheme
of scheduling workers hardly provides for irregular work days
as contemplated by the "guaranteed contract" exemption.  29
C.F.R. §778.405 provides that  "[this] subsection is not
designed to apply in a situation . . . where the employee works
an irregular number of hours according to a predetermined

schedule."  The exemption allows for "benefits to employees for
balancing long workweeks against short workweeks under
prescribed safeguards. . . ."  As Mr. Matalon states, most full
time drivers did not work short weeks and instead regularly
worked the full 60 hour workweek.  Second, although Mr. Matalon
claims in his Reply Affidavit that drivers were paid a
guaranteed sum per workweek unless an employee had an
"unexcused absence,"[18] the Kryzhanovsky Reply Affidavit
contradicts Mr. Matalon's Reply Affidavit.  Specifically, in
his Reply Affidavit, Mr. Kryzhanovsky states that for the
workweek of April 3, 2004 through April 9, 2005, Mr. Washington
worked 53.25 hours instead of 60 hours and so was not paid the
guaranteed sum of $575.00.  (*See* Kryzhanovsky Reply Affidavit
at ¶ 11(a); Matalon Reply Affidavit at ¶¶'s 26-27.)  Mr.
Kryzhanovsky further states:  "Had he [Mr. Washington] worked
60 hours, he would have been paid $575.00".  *Id*.  Defendants do
not state that the reduction occurred because, for example, of
Mr. Washington's "willful refusal" to perform available work.[19]

---

[18]An "unexcused absence" is defined by Mr. Matalon as
follows: "If employees took a day off equal to ten (10) hours of work,
which day was not a holiday, vacation day, personal or sick day, they
did not receive the full $450.00.  I define this kind of absence as an
'non-compensable' absence from work; or an unexcused absence."  (*See*
Matalon Reply Affidavit at ¶¶'s 12-13.)

[19]The Opinion Letter provides: "[D]eductions for time not
worked are generally not permissible under a §7(f) plan (only for
disciplinary purposes for the actual time during which an employee
willfully refuses to perform available work)".

In a true "guaranteed contract" compensation scheme, "[w]hatever sum is guaranteed must be paid in full in all workweeks, however short, in which the employee performs any amount of work for the employer.  The amount of the guarantee may not be subject to proration or deduction in short workweeks.  In other words, deductions cannot be made for time lost from work because of sickness, accidents, legal holidays and the like."  Opinion Letter, 1999 WL 1002378.

Thus, even considering defendants' "guaranteed contract" argument on its merits, the argument fails.

*V.    Arbitration of State Law Claims*

Defendants also argue that plaintiffs should arbitrate their claims because of the arbitration clause in the expired CBA.  However, Magistrate Judge Go has already ruled in this litigation that plaintiffs are not required to arbitrate their FLSA claims in a decision not appealed.  *See* November 20, 2003 Decision and Order (Go, U.S.M.J.)  Defendants in any event do not offer any authority for their renewed argument.  In *Tran v. Tran*, the Court of Appeals held that a plaintiff who was covered by a collective bargaining agreement that required arbitration of any disputes concerning the interpretation or application of the agreement can pursue his individual statutory rights under the FLSA.  *Tran v. Tran*, 54 F.3d 115, 117-18 (2d Cir. 1995).  A collective bargaining agreement

cannot preclude a lawsuit concerning individual statutory rights unless the arbitration clause in the agreement was clear and unmistakable that the parties intended to arbitrate such individual claims. *See Wright v. Universal Maritime Service Corp.*, 525 U.S. 70 (1999); see *Giles v. City of New York*, 41 F. Supp.2d 308, 311-12 (S.D.N.Y. 1999). Article 17 of the CBA provides:

Grievance Procedure and Arbitration

> 17.1 Any controversy, claim, dispute or grievance arising under this Agreement between the Employer and the Union or any employee, including but not limited to questions of meaning, interpretation, operation or application of any clause of this Agreement or by breach or threatened breach of this Agreement, directly or indirectly, shall be disposed of in the following manner. . . .

This arbitration clause does not expressly cover individual statutory claims for unpaid overtime under the FLSA, for example, or the individual state statutory claims under New York state law. *See, e.g. Kelly v. Classic Restaurant Corp.*, 2003 WL 22052845, at *4 (S.D.N.Y. Sept. 2, 2003)(rejecting motion to compel arbitration of state and federal statutory claims where arbitration clause was general)(discrimination); *Crespo v. 160 West End Ave. Owners Corp.*, 253 A.D.2d 28, 32-33 (App. Div. 1999)(arbitration not required when no unequivocal agreement to arbitrate statutory age discrimination claims in arbitration agreement).

**CONCLUSION**

Accordingly, defendants' motion for summary judgment is denied and plaintiffs' motion for partial summary judgment is granted.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Dated : Brooklyn, New York

May 9, 2005

/s/Charles P. Sifton (electronically signed)
United States District Judge